**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 9, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

JACKIE GENE NASH, JR.,

     Defendant-Appellant.

No. 04-6288

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 03-CR-148-T)**

Vickie Mandell-King, Assistant Federal Public Defender (Raymond P. Moore, Federal Public Defender, with her on the briefs), Denver, Colorado, for Defendant-Appellant.

Mary M. Smith, Assistant United States Attorney (John C. Richter, United States Attorney, with her on the briefs), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

Before **BRISCOE, McKAY,** and **McCONNELL**, Circuit Judges.

**BRISCOE**, Circuit Judge.

     Defendant Jackie Nash was convicted, following a jury trial, of two drug trafficking offenses and a related firearm offense. Nash was sentenced on those convictions to a lengthy term of imprisonment. Nash now appeals his convictions and

sentence.  We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm his convictions, but remand with directions to vacate his sentence and resentence.

I.

*Factual background*

In 2002, an Oklahoma City, Oklahoma, resident named Arlondo Jones was charged in federal court with possession with intent to distribute cocaine.  Jones operated a business in Oklahoma City named Audio Connections that specialized in selling and installing car audio, video, and alarm systems.  Through that business, Jones also functioned as a drug-trafficking "middleman," connecting persons seeking drugs with drug sources.  It was as a result of those activities that Jones was criminally charged. Jones and the government ultimately resolved the case by Jones agreeing to cooperate by providing information to the government on local drug traffickers, and the government in turn agreeing to dismiss the federal charges against Jones.

In May of 2003, as part of his agreement to cooperate, Jones contacted Angelo Orefice, a special agent with the United States Drug Enforcement Agency (DEA), and informed Orefice that he had been approached at his business by Nash, who went by the nickname of J.K., and Timothy Kinchion, who went by the nickname of Touche. According to Jones, he had engaged in approximately ten to fifteen previous cocaine deals with Kinchion involving quantities from a fourth of a kilogram to a whole kilogram. Jones informed Orefice that Kinchion, who had just been released from prison and owed money to both Jones and a drug dealer as a result of a past cocaine deal, expressed an

-2-

interest in getting back into the drug business. Orefice and other agents began surveilling Nash and Kinchion. Further, Orefice provided audio and video-recording equipment to Jones and directed him to use it to record his conversations with Nash and Kinchion.

Following his initial meeting with Nash and Kinchion, Jones continued to communicate with both men. In particular, Nash and Kinchion utilized Nash's cell phone to speak on numerous occasions with Jones, with Nash typically calling Jones in the morning and Kinchion typically calling Jones in the evening. On May 30, 2003, Nash informed Jones that he had changed his cell phone number and that Kinchion could also be reached at the new number.

On June 5, 2003, Nash and Kinchion arrived together at Jones' place of business in a silver Grand Am, with Nash driving and Kinchion in the passenger seat. Nash remained in the car, while Kinchion got out and spoke with Jones about obtaining either a half or a whole kilogram of cocaine. Kinchion indicated he intended to "break [the cocaine] down" and "rock it up" into small portions. Kinchion ROA, Vol. 2 at 140.[1] Jones, relying on his familiarity with street prices for cocaine, quoted Kinchion a price of $25,000 for a kilogram of cocaine.

Following this meeting, the DEA arranged for Jones to engage in a "reverse sting" with Nash and Kinchion, whereby the government would provide the cocaine to Jones

---

[1] Some of the transcripts and documents relied on by Nash on appeal were submitted by codefendant Kinchion in connection with his own appeal. For purposes of this opinion, all citations to the record in Kinchion's appeal will be referred to as "Kinchion ROA," combined with the specific volume and, if necessary, document number.

who in turn would give it to Nash and Kinchion. Nash and Kinchion, apparently believing they were being "fronted" the cocaine, agreed to provide Jones with five vehicles, at least one of which was jointly owned by Nash and Kinchion, that would be used as collateral for the cocaine. Between approximately 12:00 and 12:30 p.m. on June 11, 2003, Nash and Kinchion supervised the delivery of those five vehicles, via tow truck, to Jones' shop.

At approximately 2 p.m. that same afternoon, Nash and Kinchion returned to Jones' business in the silver Grand Am. Nash remained in the car and Kinchion went inside and met briefly with Jones. During the meeting, Jones informed Kinchion that the source of the cocaine would "come up and take a look at the vehicles" and determine whether they would be sufficient collateral. Id. at 161. At the conclusion of the meeting, Jones gave Kinchion an empty cordless telephone box to carry out with him so that he would not look suspicious to Jones' employees or customers. Kinchion returned to the silver Grand Am and left Jones' business with Nash.

Shortly before 4:30 p.m. that afternoon, Agent Orefice met with Jones outside of the business and gave Jones a kilogram of cocaine wrapped in a brown paper bag, a small audio recording device, and an empty cordless telephone box. Jones called Nash's cell phone number and informed the person who answered that the cocaine had arrived. Nash and Kinchion returned to Jones' business in the silver Grand Am shortly before 5 p.m. Nash remained in the vehicle while Kinchion went inside, carrying the empty telephone box he had been given earlier. Jones and Kinchion spoke briefly, and then Kinchion left

-4-

with two identical telephone boxes – one empty and the other containing the kilogram of cocaine -- as well as a large white shopping bag and a fake receipt prepared by Jones. When Kinchion returned to the Grand Am, he placed the empty telephone box in the trunk and kept the other telephone box containing the cocaine with him in the passenger compartment.

As Nash and Kinchion left Jones' business in the Grand Am, two Oklahoma City police officers in marked cars pulled in behind them, watching for any traffic violations. Not far from Jones' business, Nash made an illegal right turn. Accordingly, one of the police officers turned on his emergency lights and attempted to stop Nash and Kinchion as they entered Interstate 44. Although Nash pulled the Grand Am over briefly to the side of the highway, he sped off again before the police officer could approach the Grand Am. A thirty-eight minute, high-speed chase in and around Oklahoma City ensued. During the course of the chase, law enforcement officers observed Kinchion throwing various items, including chunks of the cocaine, out of the passenger-side window. Nash and Kinchion were eventually stopped and arrested. In the center console of the Grand Am, law enforcement authorities recovered a loaded, operable handgun. Subsequent investigation revealed that the handgun was registered to Nash and that the Grand Am had been rented by Nash.

*Procedural background*

On July 2, 2003, a federal grand jury returned a three-count indictment against Nash and Kinchion. Count 1 of the indictment charged Nash and Kinchion with

conspiracy to possess with intent to distribute approximately one kilogram of cocaine powder, in violation of 21 U.S.C. § 846.  Count 2 charged Nash and Kinchion with possession with intent to distribute approximately one kilogram of cocaine powder, in violation of 21 U.S.C. § 841(a)(1).  Count 3 charged Nash and Kinchion with carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c).  The case proceeded to trial on October 20, 2003.  At the conclusion of all the evidence, the jury found both men guilty as charged.[2]  In response to special interrogatories, the jury also found that both of the drug-trafficking counts involved 500 grams or more, but less than 5 kilograms, of cocaine.

On August 27, 2004, the district court sentenced Nash to a term of imprisonment of 292 months, a term at the bottom of the guideline range.  The district court also, however, announced an alternative sentence, stating that if the guidelines were found to be unconstitutional, it would, in its discretion, impose a lower sentence of 180 months.

II.

*Denial of motion for continuance and motion for mistrial*

Approximately two weeks prior to trial, the government sought and was granted permission by the district court to file under seal a document entitled "Ex Parte Disclosure of Certain Material for the Court's Inspection In Camera," and a related pleading entitled "Memorandum Brief on Government Disclosure Obligation."  Kinchion

---

[2] Kinchion has since appealed his convictions and sentence.  We affirmed his convictions, but reversed and remanded for resentencing.  United States v. Kinchion, No. 04-6315, 2006 WL 2981283 (10th Cir. Oct. 19, 2006).

ROA, Vol. 1, Docs. 106, 107, 108, 109. The "Ex Parte Disclosure" pleading indicated that the government was "submit[ting] certain information . . . for the Court's inspection in camera," but asserted the government "should not be directed to deliver the material to the defendants because neither Brady nor Giglio mandate[d] its discovery." Id., Doc. 108. The accompanying Memorandum Brief explained that the information submitted by the government concerned Oklahoma City Police Department (OCPD) Detective Phil Williams, who was also a member of a DEA task force and a case agent in the pending federal cases against Nash and Kinchion. While preparing for an unrelated criminal trial in Oklahoma County District Court[3], Williams discovered the existence of a false report of investigation prepared by a DEA special agent allegedly based upon information provided by Williams. Williams notified his supervisors at both the OCPD and the DEA about the false report. On January 28, 2002, the Oklahoma County District Attorney notified the United States Attorney's Office for the Western District of Oklahoma of the issue. Although the DEA agent prepared a corrected report, the DEA's Office of Professional Responsibility nevertheless conducted an investigation regarding the false report. On July 9, 2003, a "Deciding Official" employed by the DEA's Human Resources Division issued a memorandum indicating he had completed his review of Williams' role in the false report and concluded that, "[h]ad . . . Williams been a DEA employee, [he] would have [imposed] severe disciplinary action, up to and including

_____

[3] It is unclear from the record whether this state court criminal action involved either Nash or Kinchion.

-7-

[Williams'] removal, for Making False or Misleading Statements . . . ." Id., Doc. 108, Exh. A. Because, however, Williams "[wa]s not a DEA employee and [wa]s not subject to [the Deciding Official's] authority," the Deciding Official administratively closed the case. Id. Officials at the OCPD were apparently notified of the Deciding Official's report. In turn, on September 29, 2003, the Chief and Deputy Chief of the OCPD met with the United States Attorney for the Western District of Oklahoma and informed him of the Deciding Official's report. The following day, September 30, 2003, the United States Attorney spoke with attorneys at the DEA and persuaded them to immediately release the underlying investigative report. After reviewing the investigative report, the United States Attorney contacted the Administrator of the DEA and expressed concern that Detective Williams had adamantly denied being the source of information for the false report and was denied his due process rights during the course of the investigation. The Administrator of the DEA, in turn, directed an immediate review of the matter. On October 3, 2003, the Acting Assistant Administrator of the DEA's Human Resources Division issued a memorandum rescinding the Deciding Official's July 9, 2003 memorandum "as procedurally defective." Id., Doc. 108, Exh. C. In doing so, the Acting Assistant Administrator noted that because Williams was not a DEA employee, he was "not subject to the authority of the DEA to render any decision, either clearance or discipline, with respect to any actions he t[ook] while serving on a DEA Task Force." Id. In closing, the Acting Assistant Administrator's memorandum requested that "any copies of [the Deciding Official's] July 9, 2003, memorandum" be destroyed. Id.

The government's Memorandum Brief acknowledged that both Nash and Kinchion had requested not only Brady and Giglio material, but also "[c]opies of all reports of investigation of . . . Williams conducted by the Department of Justice or any agency at the direction of or on behalf of the Department of Justice as a result of [a] prior prosecution of [Kinchion] in the United States District Court for the Western District of Oklahoma, in which . . . Williams was a principal participant."[4] Id., Doc. 109 at 4. The government's Memorandum Brief further acknowledged that Williams had testified at a suppression hearing in the present case against Nash and Kinchion.[5] Notwithstanding these facts, the Memorandum Brief asserted it was unnecessary for the government to disclose to Nash or Kinchion any of the information and documents pertaining to the DEA's internal investigation of Williams because Williams would not be a witness at trial, and because the Deciding Official's memorandum had been officially rescinded. In sum, the

---

[4] It is unclear from the record what this prior prosecution involved. The record does indicate, however, that Kinchion filed some type of motion in the prior prosecution alleging that Detective Williams made false and misleading statements in order to obtain warrants in furtherance of the prosecution. Kinchion ROA, Vol. 1, Doc. 150 at 1. The government disputed that assertion, alleging that "Williams was not an affiant on any of the search warrants that were in question in that prosecution," and instead "was [only] the affiant for the arrest warrant for Defendant Kinchion . . . ." Id., Doc. 152 at 3 (emphasis in original). It is uncontroverted that the government ultimately dismissed the prior case against Kinchion with prejudice. Id., Doc. 150 at 1.

[5] Williams apparently testified at the suppression hearing that (a) the audio and video recordings made by Jones were consensual, and (b) agents involved in the surveillance of the drug transaction between Jones, Nash and Kinchion were aware that Nash and Kinchion had cocaine in their custody after they left Jones' business and thus had probable cause to stop and arrest Nash and Kinchion. Notably, Nash does not challenge these issues on appeal.

government argued, the information did not constitute Giglio or Brady material.

On October 10, 2003, the district court issued a written order "declin[ing] to make a specific finding as to whether the documents should be produced to" Nash and Kinchion. Id., Doc. 117 at 3. In doing so, the district court expressed concerns about (a) the fact that the United States Attorney's Office for the Western District of Oklahoma did not receive the Deciding Official's memorandum until more than two months after it was authored, even though Williams was working with that office and the DEA on several matters, (b) the fact that the government failed to provide to the district court the Deciding Official's underlying investigative report, and (c) the government's failure to file its *ex parte* pleadings in a more timely fashion, particularly in light of the defendants' requests for discovery and the upcoming trial date.

On October 15, 2003, one day after the jury was selected and sworn, but five days prior to the start of the evidentiary portion of trial, the government obtained from the district court a protective order encompassing the Deciding Official's July 9, 2003 memorandum, and the Acting Assistant Administrator's October 3, 2003 memorandum purportedly rescinding the Deciding Official's memorandum. That order provided, in pertinent part, that the memoranda were "not to be disseminated beyond the defense itself" and that no copies thereof could be made by the defense. Id., Doc. 138. The following day, October 16, 2003, the government provided defense counsel with copies of the memoranda. Kinchion immediately filed a motion for continuance of the evidentiary portion of the trial, which was joined by Nash, arguing that the disclosed

-10-

memoranda "directly impact[ed] [their] defense and the theories on which [they] ha[d] founded that defense . . . ." Id., Doc. 134 at 1.  The government responded, indicating that it had "no objections to a limited continuance of trial."  Id., Doc. 143 at 1.  On October 17, 2003, the district court issued an order denying the motion for continuance. Id., Doc. 144.  In doing so, the district court noted that Williams, "the subject of the recently disclosed information," would not be testifying at trial.  Id. at 2.  Further, the district court concluded that the recently disclosed "information could only be used to impeach [Williams]" and "d[id] not go to the issues to be determined by the jury (i.e., it [wa]s not directly related to the innocence or guilt of the defendants)."  Id.  "Thus," the district court noted, "the timing of the production [wa]s not an issue."  Id.  In addition, the district court noted that Nash and Kinchion had "wholly fail[ed] to describe the investigation they allegedly need[ed] to conduct," and had "identif[ied] no witnesses to be interviewed or documents to be sought during the investigation."  Id.  Lastly, the district court noted that, "while only minimally relevant," it "ha[d] previously arranged the trial schedule in a specific manner to accommodate the parties[] and their attorneys," and had further "notified the fifteen jurors of the date the testimony [wa]s to commence and the anticipated length of the trial."  Id. at 3.

On October 20, 2003, the first day of the evidentiary portion of trial, Nash and Kinchion filed a joint motion for mistrial.  Id., Doc. 150.  They argued that, "due to the lateness of the [government's] provision of materials [regarding Detective Williams]," and "the [district court's] declination of [their] request for a continuance," they were "at a

decided disadvantage not of [their] own making in being able to demonstrate the orchestrated nature of the case, including witnesses" they "genuinely believed [were] perjurers for hire . . . ." Id. at 5. According to Nash and Kinchion, they should have been given an opportunity to conduct discovery to determine whether the OCPD had investigated the allegations of wrongdoing against Detective Williams and, if so, what the OCPD's findings were. Further, Nash and Kinchion opined that Detective Williams "ha[d] continued his practice of manufacturing evidence and witnesses." Id. at 4. In support of this assertion, Nash and Kinchion noted they had observed Williams at the Oklahoma County Jail, where they were housed pending trial, with other inmates who ultimately became prosecution witnesses.

In its response in opposition to the motion for mistrial, the government noted that the OCPD had reviewed the investigative file and tentatively concluded that the file did "not support the allegation lodged [against Williams] by [the Deciding Official]." Id., Doc. 152, Exh. B. The government further noted, however, that, "[d]ue to the seriousness of the allegation," the OCPD's "Office of Professional Standards" was "conduct[ing] an independent investigation into th[e] matter." Id. Apparently, that investigation had not been completed as of the time of trial. As for the remaining assertions in support of the motion for mistrial, the government noted, in pertinent part, that defense counsel would be "free to cross-examine the Government's other witnesses [at trial] to elicit information bearing on their credibility." Id. at 5.

On October 23, 2003 (the last day of trial), the district court issued an order

-12-

denying the motion for a mistrial. Id., Doc. 158. In doing so, the district court concluded that Nash and Kinchion had "failed to demonstrate that the recent production of certain information regarding Officer Williams impaired their right to a fair and impartial trial," particularly in light of the fact that "Williams did not testify at . . . trial," thereby rendering the documents inadmissible. Id. at 3-4.

*a) Denial of motion for continuance*

Nash contends on appeal that the district court erred in denying the joint motion for continuance. We review for abuse of discretion a district court's denial of a motion for continuance of trial. United States v. Dowlin, 408 F.3d 647, 663 (10th Cir. 2005). Under that standard, "we will find error only if the district court's decision was arbitrary or unreasonable and materially prejudiced the defendant." Id. (internal quotation marks omitted). "In determining whether a district court arbitrarily or unreasonably denied a motion for continuance," we examine the following factors: "(1) the diligence of the party requesting the continuance; (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance; (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; [and] (4) the need asserted for the continuance and the harm that appellant might suffer as a result of the district court's denial of the continuance." Id.

Applying those factors here, we conclude that the district court's decision was not arbitrary or unreasonable. To be sure, Nash acted diligently in filing the motion for continuance. It is unclear, however, whether the continuance, if granted, would have

accomplished the stated purpose underlying the motion.  As noted by the district court in denying the motion, Nash failed to describe the investigation he intended to conduct, and in particular identified no witnesses he intended to interview or documents he intended to seek.  Even assuming that the requested continuance would have allowed him to conduct discovery regarding Williams' alleged misconduct and the investigation thereof, Nash failed to establish that a continuance was necessary in light of the fact that Williams would not be appearing as a government witness at trial.  In other words, Nash failed to establish how information pertaining to Williams' purported misconduct in another criminal case would be relevant other than for purposes of impeaching Williams.  Although Nash now attempts on appeal to assert that such information would have bolstered his defense that he was innocent and was simply "set up" by law enforcement authorities, he did not clearly make that argument below.  Moreover, there is no evidence that Detective Williams engaged in any misconduct in the investigation of the offenses of conviction, and indeed the evidence of Nash's guilt was overwhelming.  Lastly, the district court found, and Nash does not dispute, that a continuance would have been inconvenient for the district court and the jurors, who had already been selected at the time the motion for continuance was filed.

*b) Denial of motion for mistrial*

Nash also contends the district court erred in denying the motion for mistrial.  "A trial court may appropriately grant a motion for mistrial only when a defendant's right to a fair and impartial trial has been impaired . . . ."  United States v. Cavely, 318 F.3d 987,

-14-

997 (10th Cir. 2003) (internal quotation marks omitted).  "We review a district court's refusal to grant a motion for mistrial for abuse of discretion."  United States v. Stiger, 413 F.3d 1185 (10th Cir. 2005) (internal quotation marks omitted).  "In reviewing a court's determination for abuse of discretion, we will not disturb the determination absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment."  Id. (internal quotation marks omitted).

A review of the record on appeal indicates that Nash's right to a fair and impartial trial was not impaired by the district court's limitations on his ability to engage in discovery regarding, or to present evidence at trial of, Detective Williams' alleged misconduct or the investigation thereof by the DEA or the OCPD.  Although Nash suggests on appeal that such evidence would have bolstered his defense that he was "set up" by law enforcement authorities, the evidence at trial wholly refutes that suggestion. During the government's case-in-chief, both Nash and Kinchion were able to extensively question prosecution witnesses regarding the cocaine transaction at issue, as well as Detective Williams' role in setting up the reverse sting operation.  Nothing in that solicited testimony suggested any wrongdoing on the part of Williams, nor did it remotely suggest that Nash was the victim of a "set up."[6]  To the contrary, the evidence of his

_____

[6] Nash, in his appellate brief, suggests that, if nothing else, he could have introduced, pursuant to Federal Rule of Evidence 404(b), evidence of Williams' misconduct in the unrelated cases.  That suggestion, however, lacks merit.  Such evidence surely would have been excluded by the district court, and rightly so, as irrelevant.  E.g., United States v. Taylor, 417 F.3d 1176, 1179-80 (11th Cir. 2005) (affirming exclusion of

intent to knowingly conspire to possess, and to actually possess, the kilogram of cocaine was overwhelming. Thus, we conclude the district court acted well within its discretion in denying the motion for mistrial. See generally Cavely, 318 F.3d at 997 (concluding that, in light of the overwhelming evidence of the defendant's guilt, the district court did not abuse its discretion in denying motion for mistrial based upon admission of improper evidence).

## *Bruton error*

Nash contends the district court violated the rule announced in Bruton v. United States, 391 U.S. 123 (1968), by admitting into evidence testimony from three witnesses regarding post-arrest statements made to them by Kinchion. In Bruton, the Supreme Court held that the admission of a nontestifying codefendant's confession implicating the defendant at their joint trial violates the defendant's Sixth Amendment Confrontation Clause rights. 391 U.S. at 137; see also United States v. Sarracino, 340 F.3d 1148, 1159-60 (10th Cir. 2003). We have since emphasized, however, that the rule announced in Bruton is a limited one. Specifically, "Bruton applies only in those few contexts where the statement is so inculpatory as to the defendant that the 'practical and human limitations of the jury system cannot be ignored.'" United States v. Rahseparian, 231 F.3d 1267, 1277 (10th Cir. 2000) (quoting Bruton, 391 U.S. at 135). In other words, the Bruton rule does not apply to "statements that are not directly inculpatory but only inferentially incriminating." Id. at 1277; see Gray v. Maryland, 523 U.S. 185, 195 (1998)

_____

similar evidence in a criminal case).

(noting that the decision in <u>Richardson v. Marsh</u>, 481 U.S. 200 (1987), "placed outside the scope of <u>Bruton</u>'s rule those statements that incriminate inferentially."). We review de novo any alleged <u>Bruton</u> errors.[7] <u>See</u> <u>United States v. Verduzco-Martinez</u>, 186 F.3d 1208, 1212 (10th Cir. 1999).

Nash asserts that the challenged statements at issue are facially incriminatory and therefore violate <u>Bruton</u>. The disputed statements are as follows: First, Jay Chandler Flott, a convicted bank robber who spoke with Kinchion while at the county jail, testified that Kinchion said "his partner was driving" when they left the buy and that, as the police initiated the stop, "he had told his partner to, 'Let's get the hell out of here, man. You know what we got.'" Kinchion ROA, Vol. 3 at 365. Second, Dirk Terry, a convicted money launderer who also conversed with Kinchion at the county jail, testified that Kinchion "confirmed with his driver, the driver, that they were heavily strapped, meant that they were armed and dangerous." <u>Id.</u>, Vol. 4 at 572. Third, Terry also testified that Kinchion had said to the driver as the police approached the vehicle, "'We're going to end up doing life.'" <u>Id.</u> at 574. Fourth, Aaron Reed, a convicted cocaine trafficker who spoke with both Nash and Kinchion at the county jail, testified that Kinchion "[t]old his co-defendant, Mr. Nash, not to worry, because, he said, 'If something goes wrong, I'll take the blame. I'll take the case.'" <u>Id.</u>, Vol. 3 at 402.

---

[7] Nash did not object at trial to the introduction of the challenged evidence. He did, however, file a pretrial motion for severance, which was denied by the district court. The filing of that motion was sufficient to preserve the ensuing alleged <u>Bruton</u> error. <u>United States v. Sarracino</u>, 340 F.3d 1148, 1159 (10th Cir. 2003).

We agree with Nash that each of these statements violates Bruton. These are incriminating statements of a nontestifying codefendant that refer directly to Nash. The fact that Nash's name was not mentioned does not alter this result. It is obvious that a jury immediately would understand that the terms "partner" and "his driver" were meant to refer to Nash. Although the government contends that Flott's use of the term "partner" required an inferential deduction to establish Nash as a partner in the cocaine trafficking scheme rather than simply Kinchion's acquaintance, we disagree. The context in which this statement was made and recounted to the jury, i.e., Flott's testimony that Kinchion said to his "partner," "You know what we got," admits of no other possible inference. The same holds true for the direct references to the "driver" in statements made by Kinchion. As for the final statement, the government argues that it was actually an apology by Kinchion for getting Nash mixed up in a drug deal. While that is certainly one interpretation, it is not the only one. These statements, in our view, reflect the kind of inference the Supreme Court has sought to prohibit in joint trials.

The mere finding of a Bruton violation, however, "does not automatically require reversal of the ensuing criminal conviction." Schneble v. Florida, 405 U.S. 427, 430 (1972). Reversal is unnecessary if "we can conclude beyond a reasonable doubt that the constitutional error was harmless." Sarracino, 340 F.3d at 1160. The test for determining whether the error was harmless is "whether the jury would have returned the same verdict absent the error." Washington v. Recuenco, 126 S.Ct. 2546, 2552 (2006). In applying this standard, we review the record de novo, and our judgment is informed by the context

-18-

in which the Bruton statement was admitted, how it was used at trial, and how it compares to the properly admitted evidence. Sarracino, 340 F.3d at 1160. "'Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the . . . confession[] on the minds of an average jury.'" Id. (quoting Harrington v. California, 395 U.S. 250, 254 (1969)).

After carefully examining the trial transcript, we are convinced that the Bruton error was harmless. Although the Bruton statements were no doubt incriminatory, the properly admitted evidence of Nash's participation in the offenses of conviction was "so overwhelming, and the prejudicial effect of the" Bruton statements "so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the" Bruton statements "was harmless error." Schneble, 405 U.S. at 430. Among the key pieces of properly admitted evidence establishing Nash's guilt beyond a reasonable doubt were the following: (1) Nash and Kinchion contacted Jones in May of 2003 about the possibility of purchasing a kilogram of cocaine from him; (2) Nash provided Jones with his cell phone number in order to facilitate the ensuing discussions; (3) both Nash and Kinchion utilized Nash's cell phone to speak on numerous occasions with Jones about the cocaine transaction; (4) after changing his cell phone number in late May 2003, Nash immediately notified Jones of this change and advised that Kinchion could continue to be reached at the new cell phone number; (5) Nash and Kinchion visited Jones' shop together on several occasions in connection with the transaction; (6) at least one of the five vehicles used as collateral for the transaction was registered jointly to Nash and

Kinchion; (7) when Nash and Kinchion returned to Jones' shop to accept delivery of the cocaine, Kinchion informed Jones that Nash was scared because they had observed a police car at a nearby video store (thus indicating that Nash was aware a cocaine transaction was about to take place)[8]; (8) when an Oklahoma City police officer attempted to stop Nash's car after the cocaine transaction, Nash pulled over briefly to the side of the highway, but then sped off before the officer could approach the Grand Am; (9) Nash proceeded to lead the police on a thirty-eight minute, high-speed chase; (10) during one portion of the chase, Nash swerved close to the edge of a bridge, enabling Kinchion to throw some of the cocaine over the side of the bridge; (11) when Nash was arrested following the chase, he was found to be in possession of approximately $2,800 in cash, which Nash later told his jail cellmate (Aaron Reed) were the proceeds of prior drug transactions; (12) the firearm retrieved from the Grand Am following the search was confirmed to have been purchased earlier in the year by Nash; (13) police investigation confirmed that Nash rented the Grand Am on June 10, 2003, using cash; and (14) following his arrest, Nash made numerous inculpatory statements to his jail cellmate, Aaron Reed, indicating that he had sold cocaine on an almost daily basis for four to five years, and had picked up a kilogram of powder cocaine immediately prior to his arrest. In light of this evidence, we are firmly convinced that "the jury would have returned the

---

[8] The dissent claims this testimony was also admitted in violation of Bruton. We note, in response, that Nash has never asserted any such objection to this testimony. In any event, we would reach the same conclusion of harmlessness without consideration of this particular piece of testimony.

same verdict absent the error."  Recuenco, 126 S.Ct. at 2552.

*Booker* error

Finally, Nash challenges his sentence based upon the Supreme Court's decision in

United States v. Booker, 543 U.S. 220 (2005).  In Booker, the Court held that the Sixth

Amendment requires "[a]ny fact (other than a prior conviction) which is necessary to

support a sentence exceeding the maximum authorized by the facts established by a plea

of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a

reasonable doubt."  543 U.S. at 244.  To remedy the potential for Sixth Amendment

violations by a sentencing court's application of the Guidelines, the Court severed and

excised 18 U.S.C. § 3553(b)(1), which had required sentencing courts to impose a

sentence within the applicable guidelines range, subject to departures in limited cases.  Id.

at 764.  As a result, the Guidelines are now advisory.  Id. at 259.  We have recognized

two types of Booker-related error.  "First, a court could err by relying upon judge-found

facts, other than those of prior convictions, to enhance a defendant's sentence

mandatorily."  United States v. Gonzalez-Huerta, 403 F.3d 727, 731 (10th Cir. 2005) (en

banc).  This type of error, which violates the Sixth Amendment as described in Booker, is

generally referred to in this circuit as "constitutional Booker error."  Id.  "Second, a

sentencing court could err by applying the Guidelines in a mandatory fashion, as opposed

to a discretionary fashion, even though the resulting sentence was calculated solely upon

facts that were admitted by the defendant, found by the jury, or based upon the fact of a

prior conviction."  Id. at 731-32.  This type of error is referred to as "non-constitutional

-21-

<u>Booker</u> error." <u>Id.</u> at 732.

Nash alleges, and we agree, that the district court committed constitutional <u>Booker</u> error by enhancing his sentence mandatorily on the basis of judicially-found facts. In calculating Nash's base offense level, the district court utilized the drug quantity table set forth in U.S.S.G. § 2D1.1(c) and, rather than relying upon the jury's finding that Nash knowingly possessed approximately one kilogram of powder cocaine, instead found, based upon the evidence presented at trial, that Nash intended to convert the kilogram of powder cocaine into crack cocaine. In turn, the district court imposed a base offense level of 36, instead of the base offense level of 26 that would have been applied had the district court relied solely upon the jury's findings. The district court also imposed a two-level enhancement on Nash pursuant to U.S.S.G. § 3C1.2 for his having recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from law enforcement officers. Lastly, the district court imposed an additional two-level enhancement on Nash pursuant to U.S.S.G. § 3C1.1 for having committed perjury at trial.

Because Nash asserted a timely challenge to the district court's enhancements, he sufficiently preserved his claims of error under <u>Booker</u>. <u>United States v. Labastida-Segura</u>, 396 F.3d 1140, 1142-43 (10th Cir. 2005) (concluding that a <u>Blakely</u> objection sufficiently preserves a claim of error under <u>Booker</u>). Accordingly, we review for harmless error the constitutional <u>Booker</u> errors committed by the district court. <u>Id.</u> Under the harmless error standard outlined in Federal Rule of Criminal Procedure 52(a), the government, the beneficiary of the constitutional error, must prove that the error was

harmless beyond a reasonable doubt. In analyzing whether a preserved constitutional Booker error was harmless, two important factors are the strength of the evidence supporting the district court's factual findings and whether the district court would have imposed a less severe sentence had it known it had discretion to do so. See United States v. Riccardi, 405 F.3d 852, 875-76 (10th Cir. 2005).

An analysis of these two factors clearly leads to the conclusion that the constitutional Booker error was not harmless. Although the evidence supporting the district court's factual findings was extremely strong, if not overwhelming, the fact remains that the district court announced alternative sentences for Nash and, in doing so, expressly stated on the record that, if the Sentencing Guidelines were held to be unconstitutional, it would impose a substantially lower sentence on Nash. Indeed, the government, acknowledging these statements by the district court, concedes the constitutional Booker error was not harmless.

For the foregoing reasons, we AFFIRM Nash's convictions, but REMAND with directions to VACATE Nash's sentence and resentence him.

04-6288, *United States v. Nash*

**McKAY**, **J.**, Circuit Judge, *dissenting*.

Nearly three decades of observing and participating in the application of the so-called harmless error analysis persuades me that the courts of appeals, by reciting the *Bruton* standard but justifying its breach in the name of harmlessness, increasingly are eroding the important constitutional protection afforded by the *Bruton* barrier. Incessantly reminding the prosecution and the trial courts of their duty to prevent *Bruton* error on the one hand, while excusing its violation on the other hand, builds an ever-increasing floor under this unlawful practice rather than placing a ceiling upon it.

The circumstances of this appeal demand a stronger expression of our commitment to *Bruton*. Here, the *Bruton* error results directly from the district court's failure to hold the prosecution to its representation that it would not introduce any statements implicating *Bruton*. The consequence of that failure—the admission of numerous reinforcing prejudicial statements—goes beyond harmless.

True, *Bruton* recognized that "'[a] defendant is entitled to a fair trial but not a perfect one.'" *Bruton v. United States*, 391 U.S. 123, 135 (1968) (quoting *Lutwak v. United States*, 344 U.S. 604, 619 (1953)). We no longer adhere to the "time in the law, extending into our own century, when no error was lightly forgiven." Roger J. Traynor, *The Riddle of Harmless Error* 3 (1970) ("In that somber age of technicality the slightest error in a trial could spoil the judgment."). Accordingly, the harmless error test permits the courts of appeals to affirm decisions despite the commission of constitutional errors.

Yet, application of this test does not justify shirking our duty to protect the fairness of trials. Our duty entails analyzing the effect of the improper evidence upon the properly admitted evidence. *United States v. Glass*, 128 F.3d 1398, 1403 (10th Cir. 1997) ("To hold an error of constitutional dimension harmless, we must conclude 'the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear *beyond a reasonable doubt* that the improper use of the admission was harmless error.'" (quoting *Schneble v. Florida*, 405 U.S. 427, 430 (1972)) (emphasis added)).

The majority takes its formulation of the harmless error standard from *Washington v. Recuenco*, 126 S. Ct. 2546, 2552 (2006), a case in which the Court was not evaluating the harmlessness of the conceded error, but rather alluding to the standard that the state court should have employed. I prefer the more precise definition of the harmless error test provided in *Neder v. United States*, the case cited by the *Recuenco* Court in its discussion of harmless error: "[T]he test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" 527 U.S. 1, 16 (1999) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Since the test for sufficiency of the evidence to convict is "whether *any* rational juror" could find guilt beyond a reasonable doubt, *Schlup v. Delo*, 513 U.S. 298, 330 (1995) (reciting standard promulgated in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis added), it seems appropriate that the harmless error test is best disciplined by asking the inverse: could any reasonable juror entertain a

reasonable doubt that the prejudicial effect of the *Bruton* error contributed to the jury's

decision? *See Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (holding that correct

inquiry for harmless error review is "whether the guilty verdict actually rendered in *this*

trial was *surely unattributable* to the error" (second emphasis added)).

Nevertheless, the majority does not appear to apply even the recited standard.

While acknowledging that it must consider "'the probable impact'" of the *Bruton*

evidence "'on the minds of an average jury'" based upon an analysis of "the context in

which the *Bruton* statement was admitted, how it was used at trial, and how it compares

to the properly admitted evidence" (*ante* at 18-19 (quoting and citing *United States v.*

*Sarracino*, 340 F.3d 1148, 1160 (10th Cir. 2003)), the majority foregoes any analysis of

these considerations, instead simply concluding that its laundry list of properly admitted

evidence—much of it contested at trial—is sufficient to establish Defendant's guilt. By

wholly ignoring the significance of the wrongly admitted *Bruton* evidence, the majority

fails to address the most significant part of the standard.[1] "A reviewing court making this

harmless-error inquiry does not, as Justice Traynor put it, 'become in effect a second jury

to determine whether the defendant is guilty.'" *Neder*, 527 U.S. at 18 (quoting Traynor,

*supra*, at 21). Instead, we are meant to determine "what effect the error had or reasonably

may be taken to have had upon the jury's decision," assessed not based upon a judge's

---

[1] Certainly hosts of cases merely rule *Bruton* error harmless due to overwhelming record evidence. While most are simpler cases, to the extent that these decisions are based solely on the presence or absence of "overwhelming" evidence, they do an injustice to the harmless error standard.

personal reaction, but "with allowance for how others might react and not be regarded generally as acting without reason." *Kotteakos v. United States*, 328 U.S. 750, 764 (1946). Still, the majority discounts without consideration the prejudicial effect that the significant *Bruton* evidence must have had upon the jury.

As an initial matter, we should assess the importance that the seasoned prosecutors placed upon that wrongly admitted evidence when they looked ahead at what the jury would think of their case, rather than looking back after the jury had resolved the clear disputes in the evidence in their favor. When the accused was doing all he could to keep this evidence out, including moving to sever and moving *in limine* to preclude admission of these statements, the prosecution vigorously resisted. Indeed, despite stating that it had no intention of introducing *Bruton* evidence, the prosecution proceeded to introduce a host of prejudicial testimony and relied upon both that testimony and the implications contained therein during its closing argument. *See Arizona v. Fulminante*, 499 U.S. 279, 297-98 (1991) (noting that prosecution viewed coerced confession as essential and emphasized erroneously admitted confession in opening and closing statements); *Satterwhite v. Texas*, 486 U.S. 249, 260 (1988) (noting prosecutor's emphasis of erroneously admitted testimony in capital sentencing proceeding); *see also United States v. Sarracino*, 340 F.3d 1148, 1164 (10th Cir. 2003) (assessing effect of prosecution's repeated emphasis of improperly admitted statement). Viewing the importance of the *Bruton* testimony from the prosecution's perspective, it is apparent that the prosecution believed the *Bruton* evidence to be essential to its case, which strikes a stark contrast to

-4-

its claim on appeal that the introduction of this evidence was without consequence.

In assessing whether the district court's failure to enforce the standards of admissibility mandated by *Bruton* may have influenced the jury, it is essential to keep in mind that the critical admissible evidence and the inferences to be drawn therefrom were called into question by Mr. Nash's own sworn denial, a rarity amongst *Bruton* cases. While his denial would not be significant standing alone, the jury's implicit credibility determination against Mr. Nash becomes suspect once the trial is stripped of the improperly admitted testimony: the corroborating effect of the impermissible statements made by three government witnesses is muted. *See Fulminante*, 499 U.S. at 298 (observing that jury's assessment of improperly admitted confession "could easily have depended in large part on the presence" of other testimony); *see also Neder*, 527 U.S. at 18 (stating that *Bruton* error "infringe[s] upon the jury's factfinding role and affect[s] the jury's deliberative process in ways that are, strictly speaking, not readily calculable"). This effect is especially powerful given defense counsel's impeachment of these witnesses, who included three inmates—two of them friends—trading testimony for sentence reductions. *See Fulminante*, 499 U.S. at 300 (noting jury's determination might have been swayed by testifying witness's desire for favorable treatment). In addition, the absence of such bolstering would no doubt impact any rational juror's determination of the credibility of the government's cooperating witness, who testified to avoid drug distribution charges.

One of the most damaging pieces of admissible evidence—the claimed confession

to a cellmate whose testimony in exchange for important benefits could not be characterized as unimpeachable—was directly denied. In relying upon this evidence, the majority usurps the jury's role by implicitly determining that even absent the *Bruton* testimony, Defendant's testimony remains not credible. *See Kotteakos*, 328 U.S. at 763 ("[I]t is not the appellate court's function to determine guilt or innocence."); *cf. Zappulla v. New York*, 391 F.3d 462, 470 n.3 (2d Cir. 2004) (collecting reports indicating inherently unreliable nature of jail house informants). This approach, which turns a blind eye on the bolstering and corroborating effect of the *Bruton* evidence upon the jury's credibility assessments, does not in my judgment conform to the limited role of the harmless error analysis when deciding whether to excuse the violation of constitutional standards.

As a result of this error, the majority places undue emphasis on the importance of a host of circumstantial evidence and disregards Mr. Nash's proffered explanations for the existence of this evidence. *See United States v. Hill*, 901 F.2d 880, 885 (10th Cir. 1990) (ruling *Bruton* error not harmless where much of government's admissible evidence was circumstantial and defendant offered explanations countering government's suggested inferences). The record, while not a model of clarity, reflects that Mr. Nash never discussed the drug transaction with Mr. Jones. Mr. Jones conceded as much both on direct examination and on cross-examination. Mr. Jones admitted that Mr. Nash never left his vehicle on the occasions when Mr. Nash drove Mr. Kinchion to Mr. Jones' store. Moreover, Mr. Jones' testimony illustrates that his calls to Mr. Nash's cell phone were

made in order to speak with Mr. Kinchion, who apparently did not have a cell phone of his own. Mr. Jones also testified that Mr. Kinchion first approached him at his store without Mr. Nash, having been driven there by a woman. This contradicts police testimony that Mr. Nash first approached Mr. Jones. Additionally, according to Mr. Nash, the $2,800 found in his possession came almost entirely from the recent sale of two cars, which he was able to establish with sales receipts. Mr. Nash's father confirmed that Mr. Nash frequently bought and sold cars to make money. Mr. Nash also argued that his name likely appeared on the registration of one of the five collateral vehicles because Mr. Kinchion improperly completed the re-registration after Mr. Nash sold the car to Mr. Kinchion. Also, Mr. Nash was a regular customer of the car rental shop, as acknowledged by the rental car owner, rendering his use of the Grand Am innocuous. Whether Mr. Nash intentionally swerved toward the edge of the bridge in order to facilitate the ejection of drugs by Mr. Kinchion, who had been tossing drugs out of the window well before the car approached the bridge, is not clear from the record. Lastly, the majority infects its own decision with *Bruton* evidence by relying on Mr. Jones' testimony that Mr. Kinchion claimed Mr. Nash was nervous after seeing a police car parked nearby.

The majority's failure to address the overall effect of the *Bruton* evidence strips the harmlessness test of a crucial component while reducing the overwhelming evidence requirement to no more than a sufficiency-of-the-evidence examination. Because I

-7-

cannot say that the cumulative *Bruton* error was harmless beyond a reasonable doubt, I would reverse and remand for a new trial.