**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 18, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RICHARD CLARK, a/k/a Rick Clark,

Defendant-Appellant.

No. 10-5152

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:09-CR-00013-JHP-2)**

Scott A. Graham (Anthony L. Allen, with him on the briefs), of Graham, Allen & Brown, PLLC, Tulsa, Oklahoma, for Defendant-Appellant.

Claire McCusker Murray, Appellate Section, U.S. Department of Justice, Washington, D.C. (Thomas Scott Woodward, United States Attorney, Catherine J. Depew, Assistant United States Attorney, Northern District of Oklahoma; Kevin B. Muhlendorf and Andrew H. Warren, Trial Attorneys, Lanny A. Breuer, Assistant Attorney General, Criminal Division, Greg D. Andres, Acting Deputy Assistant Attorney General, Criminal Division, and Joseph Palmer, Attorney, Criminal Division, Appellate Section, U.S. Department of Justice, Washington, D.C., on the brief), for Plaintiff-Appellee.

Before **HARTZ**, **O'BRIEN**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

Defendant-Appellant Richard Clark was charged and convicted of multiple counts relating to his participation in a "pump-and-dump" securities fraud scheme. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm Mr. Clark's conviction.

## I. Factual and Procedural Background

This case arises from a classic pump-and-dump scheme that was orchestrated principally by Mr. Clark's co-defendant, George David Gordon. In a separate opinion, we recently affirmed Mr. Gordon's convictions and sentence. *See United States v. Gordon*, 710 F.3d 1124 (10th Cir. 2013). In doing so, we set forth in considerable detail the relevant factual and procedural background related to the government's prosecution of the pump-and-dump scheme. *See id.* at 1128–33. Consequently, we will not fully reiterate that discussion here. Instead, we offer at the outset a factual and procedural overview, and then in connection with the resolution of Mr. Clark's specific legal challenges, we explicate necessary additional facts.[1]

_____

[1] In *Gordon*, we quoted in part the indictment's description of the general nature of a pump-and-dump scheme, 710 F.3d at 1128 n.2; it is also useful to do so here:

> A pump and dump scheme involves the artificial manipulation of the price and volume of a particular stock in order to later sell that stock at an artificially inflated price. Generally, the perpetrators of a pump and dump scheme obtain control over a substantial portion of free trading shares of the company. Free

(continued...)

-2-

In summary, the government alleged that Messrs. Gordon and Clark and other co-conspirators manipulated the shares of several "penny-stock" companies by using false and backdated documents to make those shares publicly tradeable, engaged in coordinated trading among themselves to create the false appearance of an active market for the shares, and promoted the shares through misleading promotional campaigns. *See, e.g.*, *id.* at 1128 & n.2. The shares were sold to

[1](...continued)
trading shares are shares of stock that the owner can trade without restriction on a national exchange, e.g., the New York Stock Exchange or NASDAQ, or are traded in the over-the-counter market via the Pink Sheets. To obtain the free trading shares, the perpetrators may orchestrate a reverse merger, which occurs when a privately held company with no publicly traded stock merges with a publicly listed shell company that has no assets or revenue but has stock available for public trading, resulting in a public company. The pump usually involves artificially inflating a company's stock price by engaging in coordinated trading of the stock in order to create the appearance of a more active market for that stock. The pump also usually involves disseminating false and misleading promotional materials—unsolicited advertisements touting a particular stock and encouraging others to purchase the stock, which are often sent to millions of recipients by fax or email "blasts." After pumping the stock, the perpetrators dump their shares, meaning they sell large volumes of the shares that they own and control to unsuspecting investors. The dumping often occurs soon after the dissemination of the promotional materials touting the particular company. The perpetrators of a pump and dump scheme will often "park" their shares by depositing or transferring them into different accounts, including nominees' accounts, and then trade the manipulated stock using the different accounts in order to conceal their trading activity.

R., Vol. I, at 55–56 (Indictment, filed Jan. 15, 2009).

unsuspecting buyers after their prices had surged, and the conspirators laundered the proceeds through an array of bank accounts and nominees. The conspirators subsequently covered up their misconduct in interactions with the Securities and Exchange Commission ("SEC").

## A. Investigation and Pretrial Proceedings

The conduct in this case can be traced back to 2004 when Mr. Gordon began dealing with Mark Lindberg and Joshua Lankford, two Dallas stock promoters—both co-conspirators—and collaboratively targeting with them various companies for the fraudulent scheme's purposes. Through a sequence of transactions, the conspirators established and fraudulently promoted the stock of three companies: National Storm Management ("National Storm"), Deep Rock Oil & Gas ("Deep Rock"), and Global Beverage Company ("Global Beverage"). *See id.* at 1129–32.

In 2004, SEC official Samuel Draddy began looking into an unrelated Pink Sheet[2] company that had "unusual trading surrounding its stock and appeared to be the subject of a promotional campaign." R., Vol. VIII, at 1753 (Test. of Samuel Draddy, dated Apr. 15, 2010). This led to further investigation of other

_____

[2] "The Pink Sheets are a daily publication of the National Quotation Bureau (NQB), a private company. Printed on pink paper, the pink sheets list penny stocks, their marketmakers, and their price." *United States v. Sneed*, 34 F.3d 1570, 1575 n.7 (10th Cir. 1994); *see also Gordon*, 710 F.3d at 1130 (describing the Pink Sheet system and noting that Pink Sheet companies are "not required to file periodic reports with the SEC").

"similarly-situated [stock] issuers" with unusual trading patterns and promotional campaigns. *Id.*

After taking a deeper look, investigators noticed that the companies under consideration evinced similar patterns where "the people involved owned shells, [that] were publicly-traded issuers that had no legitimate business purpose, . . . [and] [t]hey would . . . get private companies to reverse-merge into these shells so they could get publicly traded." *Id.* at 1754; *see also id.*, Vol. I, at 55 (noting in the instant indictment that "[t]o obtain the free trading shares, the perpetrators may orchestrate a reverse merger, which occurs when a privately held company with no publicly traded stock merges with a publicly listed shell company that has no assets or revenue but has stock available for public trading, resulting in a public company"). Based on this discovery, the investigators turned their attention to the activities of the companies involved in this case. During that investigation, Mr. Clark testified before the SEC. He made various statements, including an allegedly false denial that he controlled nominee entities involved in the Deep Rock trading scheme.

In July 2007, approximately eighteen months prior to the commencement of criminal proceedings against Mr. Clark, the government placed a caveat on his residence. *See generally Black's Law Dictionary* 252 (9th ed. 2009) (defining "caveat" as "[a] warning or proviso"). No notice was given to Mr. Clark at that time, and he was not aware of the caveat until July 2008 "when he was attempting

to obtain funds to retain counsel." Aplt. Opening Br. at 2. The government temporarily lifted the caveat in June 2009 to allow Mr. Clark to renew an existing loan on his home, and reimposed it in July 2009. The government then completely lifted the caveat in October 2009.

On January 15, 2009, the grand jury returned a twenty-four-count indictment against the members of the conspiracy, including Mr. Clark. Mr. Clark was named in Counts 1–21: specifically, conspiracy (Count 1), in violation of 18 U.S.C. § 371; wire fraud (Counts 2–10), in violation of 18 U.S.C. §§ 1343 and 2(a); securities fraud (Counts 11–15), in violation of 15 U.S.C. §§ 78j(b), 78ff, 17 C.F.R. § 2401.10b-5, and 18 U.S.C. § 2(a); and money laundering (Counts 16–21), in violation of 18 U.S.C. §§ 1957(a) and 2(a).

## B. Trial

At trial,[3] the government called witnesses to summarize the details of the conspiracy, including Mr. Lindberg and Richard Singer (another co-conspirator); both men had pleaded guilty to criminal offenses related to the conspiracy. SEC Investigator Draddy testified about the promotional campaigns and Mr. Clark's testimony before the SEC. Other witnesses were called to summarize

---

[3] The district court ordered a continuance under the Speedy Trial Act and set the trial date for January 19, 2010. The presiding judge later recused himself in late 2009, and Judge James Payne was assigned to the case. Judge Payne then reset the trial date to March 29, 2010. The trial ultimately began on April 5, 2010.

documentary evidence. Mr. Clark unsuccessfully moved to sever his trial from

Mr. Gordon's due to the alleged potential for a prejudicial spillover of evidence

that was admitted concerning both Mr. Gordon and the other co-conspirators. Mr.

Clark ultimately was convicted of fourteen of the twenty-one counts for which he

was indicted. He was sentenced to 151 months' imprisonment.[4]

## II. Discussion

Mr. Clark asserts numerous grounds of error. He claims that the pretrial

placement of the caveat on his property violated his constitutional rights and that

the evidence was insufficient to convict him. He further contests the district

court's refusal to appoint an additional or a substitute defense counsel who was

well versed in complex securities matters and the court's failure to sever his trial

from Mr. Gordon's. He also contends that his rights under the Speedy Trial Act

were violated by the roughly fourteen-month delay between the filing of the

indictment and commencement of trial. We address each contention but discern

---

[4] The government seeks to supplement the record under seal with multiple sentencing documents that are not included in the parties' appendices. Most of these documents are interim versions of Mr. Gordon's pre-sentence investigation report and the district court's Statement of Reasons for imposing sentence in his case. One document in particular relates to Mr. Clark's appeal: an addendum to his pre-sentence report. We already have resolved the motion as it pertains to Mr. Gordon's case, granting it in part. *See Gordon*, 710 F.3d at 1160 n.35. Mr. Clark does not object to supplementing the record with his pre-sentence addendum. With this in mind, we **grant** in part the motion with respect to the addendum. The rest of the motion does not directly implicate Mr. Clark or our resolution of his appeal and, therefore, we **deny** the remainder of the motion as moot.

no reversible error.

## A. Constitutional Challenges Arising from the Government's Caveat

Mr. Clark claims that "[t]he government violated [his] constitutional rights to due process and a fair trial" in its pre-indictment decision to place a caveat on his home, without notice. Aplt. Opening Br. at 6. By the time the government lifted the caveat on Mr. Clark's home, he claims that he had no income because of the government's other post-indictment restrictions on his business activities—*viz.*, restrictions concerning his ability to liquidate various stock holdings. Therefore, Mr. Clark allegedly was unable to pay for chosen counsel and unable to secure a loan against his house for the same purpose.[5]

Mr. Clark claims that the government acted wrongfully in imposing the caveat on his house. He reasons that his house was not forfeitable property.[6] As

---

[5] Mr. Clark contends that the October 2009 release of the caveat was done "with the express condition that no new funds could be advanced on the home." Aplt. Opening Br. at 6. The government counters that Mr. Clark is "wrong" and that the condition of which he speaks applied to the earlier, temporary release in June 2009, not the release in October 2009, which was unconditional. *See* Aplee. Br. at 46. The government's position is supported by the record (indeed, by a motion filed by Mr. Clark's attorneys in the district court). *See* R., Vol. I, 178 (Am. Mot. & Br. to Withdraw as Counsel, filed Nov. 18, 2009) ("On October 2, 2009, the Government lifted the caveat on Mr. Clark's home.").

[6] "The key to whether property is forfeitable is whether it is 'involved in' or 'traceable to' the offense." *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998) (quoting 18 U.S.C. § 982(a)(1)). Mr. Clark contends that, at most, his house was "substitute property" that was off-limits to the government unless and until he was convicted, citing our decision in *United States v. Jarvis*,

(continued...)

a consequence, once the caveat was imposed, he contends, the Due Process Clause of the Fifth Amendment, as interpreted in our decision in *United States v. Jones*, 160 F.3d 641 (10th Cir. 1998), required a post-restraint, pretrial hearing on whether the house was in fact forfeitable property—a hearing that Mr. Clark says he was wrongfully denied.

---

[6](...continued)
499 F.3d 1196 (10th Cir. 2007). In resolving Mr. Gordon's appeal, we had occasion to explicate the concept of substitute property and the contours of *Jarvis*'s holding regarding it. We stated:

> [I]n order for the government to forfeit substitute property, it must establish that through "any act or omission of the defendant" one of five things has occurred—for example, forfeitable property cannot be located through the exercise of due diligence, or such property has been placed beyond the jurisdiction of the court. 21 U.S.C. § 853(p)(1). Furthermore, we reasoned in *Jarvis* that because the government has no *pre-conviction* interest in substitute property, it may not impose pre-trial restraints on a defendant's substitute property.

*Gordon*, 710 F.3d at 1136 n.14. In contrast, as we further noted in *Gordon*:

> Assets that are properly forfeitable are not the defendant's rightful property. As ill-gotten gains, they are another person's money. Indeed, these assets may belong to the government by virtue of the relation-back provision of 21 U.S.C. § 853(c), which by operation of law vests title to forfeitable property in the government upon the commission of the act giving rise to forfeiture.

*Id.* at 1135 n.13 (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 625–26 (1989), and *Jarvis*, 499 F.3d at 1203) (internal quotation marks omitted).

"We review de novo the extent of constitutional rights . . . ." *Jones*, 160

F.3d at 645; *see United States v. Rivas-Macias*, 537 F.3d 1271, 1276 (10th Cir.

2008). However, when a defendant does not properly raise a challenge in the

district court, and "there is no suggestion of a knowing, voluntary failure to raise

the [claim]," it is forfeited and our "rigorous plain-error standard governs our

review." *United States v. Cooper*, 654 F.3d 1104, 1117 (10th Cir. 2011). Under

this rigorous standard, a defendant must demonstrate: "(1) an error, (2) that is

plain, which means clear or obvious under current law, and (3) that affects

substantial rights. If he satisfies these criteria, this Court may exercise discretion

to correct the error if [4] it seriously affects the fairness, integrity, or public

reputation of judicial proceedings." *Id.* (alteration in original) (quoting *United*

*States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007)) (internal quotation marks

omitted).

*Jones* was decided in the post-indictment, pretrial context. *See* 160 F.3d at

645 ("[W]e next address whether due process nevertheless requires a pre-trial

hearing at which defendants may challenge the grand jury's findings."). There,

we concluded that "[t]he procedural aspect of the Fifth Amendment Due Process

Clause," *id.*, provides a defendant with some ability to "test the [government's]

forfeiture allegations," *id.* at 646. Pertinently, we reasoned that the "private

interests" at stake when access to property is impeded—specifically, the Sixth

Amendment right to counsel of choice and the payment of living

expenses—together with the "risk of an erroneous deprivation through [pretrial restraint procedures,]" weighed in favor of a post-restraint, pretrial adversarial hearing "at which the government must establish probable cause to believe that the restrained assets are traceable to the underlying offense." *Id.* at 646–47.

We noted, however, that "[d]ue process does not automatically require" such a hearing. *Id.* at 647. A hearing should be held "only upon a properly supported motion by a defendant," wherein he must (1) "demonstrate to the court's satisfaction that []he has no assets, other than those restrained, with which to retain private counsel and provide for [him]self and [his] family"; and (2) "make a prima facie showing of a bona fide reason to believe the grand jury erred in determining that the restrained assets" are forfeitable property. *Id.*; *see also United States v. Kaley*, 579 F.3d 1246, 1254–55 (11th Cir. 2009) (conducting a similar inquiry).

In this case, the government imposed a caveat under Oklahoma law on Mr. Clark's house roughly eighteen months prior to his indictment, but Mr. Clark was never provided notice or a subsequent hearing. We assume without deciding that an Oklahoma caveat constitutes a pretrial restraint of assets sufficient to trigger a defendant's procedural due process rights under *Jones*.[7] *Cf. Jarvis*, 499 F.3d at

---

[7] To be sure, it is not clear that common law, public impediments like caveats (or *lis pendens*) are functionally equivalent to the type of restraints triggering our inquiry in *Jones*. For instance, in *Jones*, the government obtained a

(continued...)

-11-

1198–1200 (implying that a New Mexico *lis pendens* may constitute a

"restraint"). However, even if it does, Mr. Clark faces a formidable—and,

ultimately, insurmountable—obstacle in pursuing this claim: Mr. Clark did not

properly seek a hearing prior to trial to vindicate his interests related to the

imposition of the caveat, much less make an adequate showing for a hearing

under *Jones*'s standards.[8]

---

[7](...continued)
restraining order under 21 U.S.C. § 853(e)(1)(A) to *freeze* assets named in the indictment. *See* 160 F.3d at 643. Furthermore, on a continuum of constraints, common law impediments—like a *lis pendens* or caveat—plainly do not amount to a full scale seizure of the underlying property, where the defendant has no residual control over it. *Cf. United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 62 (1993) (holding that due process requires the government to "afford notice and a meaningful opportunity to be heard before seizing real property subject to civil forfeiture"). However, we are content to assume *without deciding* that the placement of the Oklahoma caveat implicates our dictates in *Jones—viz.*, that it constitutes a "restraint" presenting the right to a post-restraint, pretrial hearing. *But cf.* Stefan D. Cassella, *Asset Forfeiture Law in the United States* § 17-8, at 526 & n.77 (2007) (collecting cases and noting that the "[t]he filing of a *lis pendens* is not a restraint within the meaning of § 853(e)").

[8]     We recognize that Mr. Clark contends that he did seek a *Jones* hearing. But he did not properly do so, if at all. In his opening brief, he claims that "[a] post-restraint, pretrial hearing was requested by co-defendant David Gordon (Dkt. 79) and incorporated by reference by Clark (Dkt. 78)." Aplt. Opening Br. at 8. The document to which Mr. Clark refers (i.e., the district court's document 78) is his attorneys' first motion to withdraw, or in the alternative, to sever or continue the trial. *See* R., Vol. I, at 171 (Mot. & Br. to Withdraw as Counsel, filed Nov. 17, 2009). There, his attorneys complained to the court that the caveat on Mr. Clark's home was "a proximate cause of Mr. Clark's inability to raise sufficient funds for his defense in this case." *Id.* While the motion noted that the government imposed the caveat without notice, *see id.*, *nowhere* in the document was a hearing requested, and it certainly did not make the showing for a hearing mandated by *Jones.* As for the purported incorporation

(continued...)

-12-

by reference, this document does not even reference Mr. Gordon's hearing request. The incorporation by reference that Mr. Clark presumably seeks to direct us to is actually found on the third page of his *amended* motion to withdraw, or in the alternative, to sever or continue the trial. Specifically, the motion states, "The Government's heavy hand in the imposition of caveats is not restricted to its actions in respect of Mr. Clark. *See* motion of co-defendant David Gordon filed in this case November 17, 2009." *Id.* at 179 (Am. Mot. & Br. to Withdraw as Counsel, filed Nov. 18, 2009). That is it. Nothing more. And Mr. Clark's counsel confirmed in oral argument that this is the extent of his purported incorporation by reference. *See* Oral Arg. at 21:15–22:35. However, in the document that Mr. Clark references, Mr. Gordon sought at least three forms of relief, including an evidentiary hearing before the district court, citing *Jones* as supportive authority. *See* R., Vol. X, at 29–31 (Def. David Gordon's Mot. to Dismiss, filed Nov. 17, 2009). Mr. Clark's single, vague, and enigmatic sentence referencing the *whole document* should not be deemed sufficient to have captured Mr. Gordon's specific *Jones* argument and placed it before the district court. Indeed, the sentence does not even amount to a bare-bones "me too" form of argument adoption (which would be questionable in itself here because it would not offer a particularized showing regarding Mr. Clark's circumstances). More specifically, the sentence does not even mention a hearing request, or for that matter any other specifics that might be found in Mr. Gordon's filing.

Significantly, our independent examination of the district court's documents suggests that the magistrate judge remarkably did manage to divine in Mr. Clark's filings a request for an evidentiary hearing "apparently to examine the Government's conduct in this and other cases relating to pretrial restraints on a criminal defendant's assets," *id*, Vol. I, at 347 (Order, dated Dec. 9, 2009), and denied relief. However, Mr. Clark is not well-postured on appeal to avail himself of the benefits of the magistrate judge's impressive industriousness. Not only does Mr. Clark not discuss the magistrate judge's order in connection with his due process/*Jones* challenge, he also fails (in his opening brief or otherwise) to fashion an argument for why this challenge should be deemed preserved for review, based upon the magistrate judge's decision to rule on his purported hearing request. And we certainly will not attempt to craft an argument of this sort for him. Accordingly, any such preservation argument is waived. *See, e.g.*, *United States v. Bader*, 678 F.3d 858, 894 (10th Cir. 2012) (noting that defendant "devotes only a single sentence to [his] argument" in his opening brief and "[t]hat

(continued...)

Consequently, for this reason (and possibly another, *see supra* note 8), Mr.

Clark may have waived his due process challenge. *Cf. Sandoval v. City of

Boulder*, 388 F.3d 1312, 1329 (10th Cir. 2004) ("Sandoval has waived any

argument that she was denied due process by failing to request the hearing to

which she now claims she was entitled."); *cf. also Kaley*, 579 F.3d at 1261 n.5

(Tjoflat, J., specially concurring) (discussing a prior Eleventh Circuit decision in

which the "defendants had waived their challenge to the constitutionality of . . .

*ex parte* restraints [on property] by not presenting it to the district court").

However, going to great lengths to ensure that Mr. Clark receives his full day in

---

[8](...continued)
is not enough"). Furthermore, even if Mr. Clark had referenced the magistrate judge's order and attempted before us to make a preservation argument based upon it with respect to his due process/*Jones* challenge, he would have another problem: he did not file an objection to the magistrate judge's denial of his purported request for a hearing. *See* R., Vol. I, at 348–51 (Objection to Magistrate's Order, dated Dec. 15, 2009) (failing to address the hearing ruling). Therefore, under our firm waiver rule, appellate review of the hearing denial would be barred. *See, e.g.*, *Morales-Fernandez v. INS*, 418 F.3d 1116, 1119 (10th Cir. 2005); *In re Carpenter*, 205 F.3d 1249, 1253 (10th Cir. 2000). When all is said and done, then, the best that Mr. Clark could ever hope for is plain-error review of his due process claim—that is, his claim  predicated on the district court's purported failure to give him the opportunity to have a *Jones* hearing regarding the government's imposition of a caveat. Going to great lengths to ensure that, to the extent reasonably feasible and consistent with the adversary process, Mr. Clark has his day in court, as noted *infra*, we afford him this best-case, plain-error scenario. *Cf. Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013) (noting that "the decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary" and proceeding to consider petitioner's argument "even though [it was] not obliged to do so" where "certain factors militate[d] in favor of considering [the argument at issue], but only under the demanding plain-error standard").

court, we assume that Mr. Clark's failure to properly seek a post-restraint, pretrial hearing under *Jones* amounted to a forfeiture. Even affording him this best-case scenario, Mr. Clark's circumstances are rather grim: in order to prevail, he must "successfully run the gauntlet created by our rigorous plain-error standard of review." *United States v. McGehee*, 672 F.3d 860, 876 (10th Cir. 2012). This he cannot do. Mr. Clark cannot even establish the first prong of the plain-error test; in other words, he cannot demonstrate that the district court committed error at all.

Mr. Clark learned about the caveat in July 2008—a year after it had been imposed and six months prior to his indictment. But he never properly asked the district court for a post-restraint hearing regarding the caveat under our decision in *Jones*. That is, he never filed the motion that *Jones* requires, never properly alerted the district court to his desire for a *Jones* hearing, and nowhere sought to demonstrate that he could satisfy the test that *Jones* sets forth. Accordingly, the district court had no reason to conclude that Mr. Clark's interests were in jeopardy and required protection through a hearing. *See Jones*, 160 F.3d at 647 ("[A] post-restraint, pretrial hearing [is required] only upon a properly supported motion by a defendant. Due process does not automatically require a hearing . . . .").

The procedures required by our decision in *Jones* are in place to protect a defendant from an intrusion upon his property interest without due process. *See*

-15-

*id.* at 645–46 ("[A] restraining order issued under section 853(e)(1)(A) deprives one of property even though the assets named in the indictment are only frozen and may eventually be returned."); *cf.* 21 U.S.C. § 853(e)(1).  A defendant cannot successfully establish that a district court's decision deprived him of the affirmative protections inherent in a *Jones* hearing when the defendant has not properly alerted the court to the need for such a hearing.  *Cf. Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J*, 464 F.3d 1182, 1195 (10th Cir. 2006) ("Although [the plaintiff] could have immediately filed a grievance challenging his suspension, he chose not to do so.  In light of that, he cannot now allege that the individual Defendants deprived him of post-suspension due process."); *Luellen v. City of E. Chicago*, 350 F.3d 604, 616 (7th Cir. 2003) (noting that because "[the litigant] was provided with the opportunity for additional procedures to vindicate his rights but did not avail himself of those opportunities, . . . the requirements of due process were satisfied").  Accordingly, we conclude that Mr. Clark has not satisfied the first prong of the plain-error test—*viz.*, he has not shown that the district court erred at all.

Mr. Clark suggests that he had no opportunity to lodge a challenge to the caveat because he was not given adequate notice of its placement.  However, the record demonstrates that Mr. Clark had notice of the caveat by July 2008, nearly two years before trial.  Mr. Clark has not established that the government's failure to give notice of placement of the caveat *in 2007* affected his ability to vindicate

-16-

his interests in a timely fashion so as to facilitate retaining counsel. Consequently, we reject his due process claim—predicated upon the notion that the district court wrongly failed to afford him a post-restraint, pretrial hearing in order to contest the caveat.

Finally, we note that Mr. Clark claims in passing that the placement of the caveat "deprived [him] of his Sixth Amendment right to a fair trial," and "violated [his] right to counsel." Aplt. Opening Br. at 11–12. We reject these arguments. First, we interpret Mr. Clark's claim that he was denied a fair trial under the Sixth Amendment as a duplicative pulsation of his arguments under *Jones*. He provides nothing in his brief that would suggest that the argument supports a *separate* averment of error on appeal.

Second, we also reject Mr. Clark's claim that the government's conduct impermissibly infringed on his Sixth Amendment right to counsel of choice. Mr. Clark failed to raise this claim in a legally cognizable manner before the district court. To be sure, in the amended motion to withdraw of Mr. Clark's trial counsel, counsel did suggest that the government's conduct violated Mr. Clark's Sixth Amendment right to counsel. And, in positing a possible "solution" to the dilemma, Mr. Clark's attorney set forth a number of hypothetical resolutions, including "dismissal of the charges against Mr. Clark at least for all of the reasons set forth in the David Gordon motion." R., Vol. I, at 179.

However, the motion of Mr. Clark containing this comment was geared

-17-

primarily toward seeking either withdrawal of counsel because of Mr. Clark's failure to pay legal fees, or remedies so that Mr. Clark could obtain the necessary income to compensate current counsel, i.e, severance or a continuance of trial. *See id.* at 177 (seeking "withdraw[al]," "severance," or "continuance"). This single, unadorned statement alluding to a separate, potential Sixth Amendment right-to-counsel claim could not reasonably alert the district court to such a claim, at least in the form that the claim is presented here. Indeed, both the magistrate judge (in resolving the motion) and the government (in responding) expressly declined to speculate on the contours of Mr. Clark's allegations. *See, e.g.*, *id.*, at 344 n.1 ("The Court declines to address this one-sentence unsupported suggestion that the charges should be dismissed.").

In sum, the district court was not afforded the "opportunity to consider the question." *United States v. Norman T*, 129 F.3d 1099, 1106 (10th Cir. 1997). Consequently, we review it only for plain error, as we did Mr. Clark's due process claim. *See United States v. Lamirand*, 669 F.3d 1091, 1098 n. 7 (10th Cir. 2012).

Under plain-error review, at the very least, Mr. Clark's claim fails under the third prong. In making his skeletal right-to-counsel argument, like (his co-defendant) Mr. Gordon, Mr. Clark relies on the district court and Second Circuit decisions in the *Stein* criminal case. *See United States v. Stein*, 541 F.3d 130 (2d Cir. 2008); *United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006); *see also*

-18-

*Gordon*, 710 F.3d at 1137 (noting that Mr. Gordon "heavily relies" on *Stein*). Similar to the fate of Mr. Gordon's argument, Mr. Clark's right-to-counsel argument fails under the third prong for two principal reasons. First, Mr. Clark "has not demonstrated that he was denied access to funds to pay for his defense in any substantial sense; certainly, he has not demonstrated a magnitude of financial deprivation anywhere close to that experienced by the *Stein* defendants." *Gordon*, 710 F.3d at 1138.

In this regard, it is significant that the district court found $225,214.81 of equity in Mr. Clark's house—the property subject to the government's caveat—to be forfeitable property because certain "payments for remodeling and the mortgage" were proceeds "traceable . . . to the conspiracy." R., Vol. VI, at 1047 (Order for Criminal Forfeiture, filed Sep. 15, 2010). That finding has support in the record. *See id.*, Vol. II, at 45 (Aff. of William Robert Taylor, filed June 25, 2010) (stating that a "significant amount" of the proceeds of stock sales directly at issue in the case "were paid directly out of [Mr. Clark's] brokerage account for residence related expenses"). And it significantly undercuts any suggestion that Mr. Clark's substantial rights were affected by any district court error in addressing the government's caveat on his home.

In particular, nothing in the Constitution "requires Congress to permit a defendant to use assets adjudged to be forfeitable to pay . . . legal fees." *United States v. Monsanto*, 491 U.S. 600, 614 (1989); *see Caplin & Drysdale*, 491 U.S. at

-19-

632 (rejecting the "claim of a Sixth Amendment right of criminal defendants to use assets that are the Government's—assets adjudged forfeitable . . . —to pay attorneys' fees"). And, in his threadbare argument, Mr. Clark has not attempted to demonstrate that any remaining equity in his home—beyond the amount subject to forfeiture—would have materially assisted him in employing or paying counsel. Accordingly, in light of the district court's forfeiture finding regarding the home, we would be hard-pressed to conclude that Mr. Clark satisfied the third prong of plain-error review.

Second, as in *Gordon*, Mr. Clark's claim of prejudice is nigh eviscerated (if not completely so) by his ongoing, active representation throughout his trial by the counsel that he initially retained. *See* 710 F.3d at 1139 ("[U]nlike *Stein*, it is quite significant that Mr. Gordon's counsel remained fully and actively engaged in the case throughout the entire trial court proceedings."). More specifically, as we recount in further detail *infra* (Part II.C), even prior to his indictment, Mr. Clark retained a very experienced criminal defense attorney, Allen Smallwood, and Mr. Smallwood represented Mr. Clark throughout the trial proceedings. And, even a cursory examination of the trial transcript would reveal that Mr. Smallwood advocated for Mr. Clark "in a thorough and vigorous fashion." *Id.* Accordingly, for this reason as well, Mr. Clark cannot demonstrate that any error by the district court affected his substantial rights (i.e., satisfied the third prong of plain error). In sum, for the foregoing reasons, we reject Mr. Clark's

constitutional challenges that stem from the government's imposition of a caveat on his home.

**B.    Sufficiency of the Evidence**

Mr. Clark challenges the sufficiency of the evidence on all of his counts of conviction.  Mr. Clark was convicted of one count of conspiracy to commit wire fraud, securities fraud, and money laundering; seven counts of wire fraud; five counts of securities fraud; and one count of money laundering.  The district court denied Mr. Clark's motion for judgment of acquittal.  We conclude that Mr. Clark's sufficiency-of-the-evidence challenges are without merit.

"In reviewing the sufficiency of the evidence and denial of a motion for judgment of acquittal, this court reviews the record *de novo* to determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *United States v. Irvin*, 682 F.3d 1254, 1266 (10th Cir. 2012).  The court may "not weigh conflicting evidence" in its review.  *Id.* (quoting *United States v. Evans*, 318 F.3d 1011, 1018 (10th Cir. 2003)) (internal quotation marks omitted).  We must "consider[] the entire record, including both direct and circumstantial evidence, together with the reasonable inferences to be drawn from it." *United States v. Mendez*, 514 F.3d 1035, 1041 (10th Cir. 2008).

**1.    Conspiracy**

Mr. Clark first asserts that the government failed to establish that he was

involved in "an agreement to commit an unlawful act," as required to support the conspiracy charge. *See, e.g.*, *United States v. Weidner*, 437 F.3d 1023, 1033 (10th Cir. 2006) (quoting *United States v. Morehead*, 959 F.2d 1489, 1500 (10th Cir. 1992)) (internal quotation marks omitted).

The evidence need not show an *express* agreement to support a conspiracy charge. *See Cooper*, 654 F.3d at 1115–16. "[T]he agreement requirement may be satisfied entirely through circumstantial evidence," *id.* at 1116; that is, it "may be inferred from the facts and circumstances of the case," *id.* at 1115–16 (quoting *United States v. Sells*, 477 F.3d 1226, 1236 (10th Cir. 2007)) (internal quotation marks omitted). Such facts and circumstances include "the joint appearance of defendants at transactions and negotiations furthering the conspiracy, the relationship among co-defendants, and their mutual representations to third parties." *United States v. Dowlin*, 408 F.3d 647, 657 (10th Cir. 2005). Furthermore, "[i]n order to sustain a jury's determination of guilt, the record need show only 'slight evidence of a particular defendant's connection with a conspiracy that has already been established through independent evidence.'" *United States v. Dickey*, 736 F.2d 571, 583 (10th Cir. 1984) (quoting *United States v. Petersen*, 611 F.2d 1313, 1317 (10th Cir. 1979)); *see also United States v. Hamilton*, 587 F.3d 1199, 1207 (10th Cir. 2009) (noting that "[t]he connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt" (alteration in

-22-

original) (quoting *United States v. Tranakos*, 911 F.2d 1422, 1430 (10th Cir.1990)) (internal quotation marks omitted)).

Based upon record evidence quite apart from Mr. Clark, it is beyond peradventure that Mr. Gordon and others were involved in a pump-and-dump conspiracy. *See Gordon*, 710 F.3d at 1129–32. Focusing then on Mr. Clark's alleged role in that conspiracy, taken in the light most favorable to the government, there was ample record evidence that he was an active participant in it. Mr. Clark was installed as Global Beverage's president because he was "in with the plan" to manipulate the stock. *See* R., Vol. VIII, at 186–87 (Test. of Mark Lindberg, dated Apr. 7, 2010). In that role, he approved a misleading brochure touting Global Beverage's financial prospects; then, only a few months later, he filed a report with the SEC questioning whether the company could continue as a going concern. *See id.* at 2291–93 (Test. of Jarom Gregory, dated Apr. 26, 2010).

Furthermore, Mr. Clark and the nominee individuals or entities operating at his behest were engaged in the bulk of the pre-promotion trading of Deep Rock shares that was designed to signal to the market a genuine interest in the stock in order to effect an artificial inflation of its price. He later profited significantly from the sale of the stock. Moreover, according to the testimony of Mr. Lindberg, Mr. Clark was an active member of the conspiracy. And the evidence supported the government's charge that Mr. Clark lied to the SEC concerning a nominee

-23-

account that he used to buy and sell Deep Rock stock.

In sum, this evidence demonstrates both Mr. Clark's extensive involvement in the conspiracy's activities and his related intent to defraud investors. *See United States v. Jenkins*, 633 F.3d 788, 804 (9th Cir. 2011) (holding that there was sufficient evidence of intent to defraud investors, relating to an alleged pump-and-dump conspiracy, where the defendant "helped create . . . offshore corporations holding [the target company's] stock, helped to sell the stock, and helped to move the various proceeds to accounts controlled by [other co-conspirators], and, further, . . . [disseminated] false and misleading [online posts]" regarding the stock); *Dowlin*, 408 F.3d at 658 (concluding that the jury could have found that the defendant participated in a fraudulent scheme, where the evidence suggested that she knew the purpose of the scheme and willingly participated); *see also United States v. Whiteford*, 676 F.3d 348, 357–58 (3d Cir. 2012) (concluding that there was sufficient evidence of a defendant's participation in a conspiracy, where he intended the conspiracy to continue so that he could "reap personal benefits" from it); *United States v. Whitney*, 229 F.3d 1296, 1301–02 (10th Cir. 2000) (holding that the evidence was sufficient to sustain a conspiracy conviction where the government showed, among other things, that the defendant shared a motive to complete the conspiracy's ultimate object and provided false evidence to effect a cover-up).

Mr. Clark highlights the fact that, at one point, he sold Deep Rock stock

"out of line," which he calls "strong evidence that he was not involved in any alleged conspiracy." Aplt. Opening Br. at 25 (quoting R., Vol. VIII, at 207–09) (internal quotation marks omitted). By way of background, consistent with the overall approach of the charged conspiracy, the conspirators were engaged in the manipulation of Deep Rock's stock price through the "coordinated trading" of its stock, and "part of the coordinated trading was to make sure that the stock [price] kept gradually going upwards." R., Vol. VIII, at 207; *see id.* at 153 (noting that it was the conspirators' "plan for the steady, gradual growth of the stock price of Deep Rock"). Mr. Clark was detected by some of the conspirators selling Deep Rock stock "out of turn" (presumably to make more short-term profits)—meaning that he "sold more shares than what he should have and the stock actually stalled out" at a certain price, instead of continuing to gradually climb upward. *Id.* at 207.

We conclude, however, that this fact—standing alone—does little to undercut the potency of the other evidence establishing Mr. Clark's culpability for the charged conspiracy. This is particularly true because Mr. Clark's alleged act of rebellion was short-lived and pusillanimous. In this regard, the evidence shows that Mr. Clark did not continue selling out of turn; shortly after his co-conspirators learned of his conduct, Mr. Gordon, "took care of it" by contacting Mr. Clark and getting him to "get back in line" with the conspirators' plan. *Id.* at 209, 211. Therefore, rather than suggesting to a rational factfinder

that Mr. Clark was not involved in the unlawful conspiratorial plan, this stock-trading incident easily could have indicated that Mr. Clark's knowing adherence to, and cooperation with, the conspiratorial plan was the rule, not the exception. *See United States v. Jackson*, 482 F.2d 1167, 1173 (10th Cir. 1973) ("If the conspiracy is established and the convicted persons knowingly contributed their efforts in furtherance of it, then the convictions must stand."); *cf. United States Thornburgh*, 645 F.3d 1197, 1205–07 (10th Cir. 2011) (rejecting argument that defendant withdrew from the conspiracy, where evidence showed that defendant "continued to participate in the conspiracy" but just "no longer communicated" with one of his co-conspirators); *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) ("The goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes."). In other words, this stock-trading incident may well have reflected the obverse of Mr. Clark's suggested inference and thus militated in favor of the jury's determination that Mr. Clark was guilty of the charged conspiracy. *See United States v. Rutland*, 705 F.3d 1238, 1251 (10th Cir. 2013) ("A person is a member of a conspiracy if he was aware of the common purpose, willingly participated in the conspiracy, and intended to advance the purpose of the conspiracy.").

In sum, there was sufficient evidence for any rational factfinder to determine that Mr. Clark was a member of the charged pump-and-dump conspiracy. Accordingly, we reject Mr. Clark's sufficiency-of-the-evidence

challenge to the conspiracy charge.[9]

### 2. Wire Fraud

Mr. Clark claims that the evidence on the wire fraud charge was insufficient to support his conviction because the government failed to prove that he intended to defraud investors through his participation in the scheme. *See United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003) (explaining that the elements of wire fraud include "an intent to defraud"). However, the evidence already set forth is more than sufficient to support a rational jury's finding that Mr. Clark had an intent to defraud.[10]

Mr. Clark makes much of the fact that, in the promotional materials that were sent to potential buyers, he had no duty to disclose his intent to sell shares. Duty or not, the promotional materials contained false and misleading information. *See, e.g.*, R., Vol. VIII, at 3144–48 (Test. of Mark Lindberg, dated Apr. 6, 2010). Moreover, Mr. Clark was engaged in coordinated selling to inflate

---

[9] Similarly, we reject Mr. Clark's hollow assertion that "the evidence presented at trial . . . indicates that the price of the stock in the various companies increased because of market events." Aplt. Opening Br. at 26. While there were other factors apart from the fraudulent conduct of Mr. Clark and his co-conspirators that *could have* affected the stock prices, the jury was not required to necessarily conclude that they did. *See Gordon*, 710 F.3d at 1144 n.22; *cf. Jenkins*, 633 F.3d at 802 ("Materiality in securities fraud does not depend on demonstration of a market reaction to the misstatements.").

[10] The magnitude of the evidence—which implicates Mr. Clark, as well as Mr. Gordon—is further explicated in our decision resolving the Gordon appeal. *See, e.g.*, *Gordon*, 710 F.3d at 1142–44.

the sales price of stock, *id.* at 207–12; and he later profited significantly, *id.* at 174–75. Any rational trier of fact could infer easily that Mr. Clark possessed a fraudulent intent based on this evidence. *See Jenkins*, 633 F.3d at 804.

### 3. Securities Fraud

Mr. Clark further challenges the sufficiency of the evidence on the securities fraud counts (Counts 11–15). "Under 15 U.S.C. § 78j(b), any person who uses or employs a manipulative or deceptive device in connection with the sale of any security commits securities fraud." *Id.* at 801–02. And Rule 10b-5, which implements § 78j(b), "forbids the making of 'any untrue statement of a material fact.'" *Id.* at 802 (quoting 17 C.F.R. § 240.10b-5(b)).

Mr. Clark does not allege that the evidence was insufficient on any specific element of the securities fraud offense. Rather, he claims that the government failed to establish securities fraud because (1) "there is always risk involved" in trading penny stocks, (2) Mr. Clark had no duty to disclose in the promotional materials his intention to sell shares, and (3) the fact that he sold shares out of line with the rest of the group suggests that "he was not connected to any agreement to defraud." Aplt. Opening Br. at 28. We reject the latter two contentions for the reasons that we articulated *supra* in disposing of Mr. Clark's challenges to his conspiracy and wire fraud convictions.

As for the first contention, it may be quite true that trading in penny stocks is risky. *See Hoxworth v. Blinder*, 74 F.3d 205, 207 n.1 (10th Cir. 1996) ("'Penny

stocks' are low-priced, *high risk* equity securities. The securities are frequently traded outside well-established trading markets." (emphasis added)); *accord Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 175 n.14 (3d Cir. 2001). However, on this record, this fact is completely irrelevant. The magnitude of the risk accompanying an investment does not mean its investors are any less harmed by fraudulent conduct; even investors who are inclined to tolerate a great deal of risk are legally entitled under the securities laws to be protected from fraudulent conduct that distorts their picture of the material variables associated with the investment. *See, e.g.*, *United States v. Russo*, 74 F.3d 1383, 1393–95 (2d Cir. 1996) (rejecting multiple challenges to defendants' mail fraud and securities fraud convictions, stemming from defendants' unlawful scheme to, *inter alia*, manipulate the price of penny stocks). Mr. Clark and his co-conspirators engaged in manipulations of penny stock that had just such a distorting effect. Put simply, in light of the evidence against Mr. Clark, any rational trier of fact could conclude that he, along with others in the conspiracy, committed securities fraud.

### 4. Money Laundering

Finally, of the six counts in the indictment relating to money laundering, the jury convicted Mr. Clark of only one—Count 18; it alleged that the defendants transmitted $245,000 of funds derived from the conspiracy. Mr. Clark challenges the sufficiency of the evidence regarding this count, contending that there was no

evidence that any transfer of funds forming the basis for this money laundering charge directly involved him. The government concedes that Mr. Clark "was not personally involved in the transaction on which his money laundering conviction . . . was based." Aplee. Br. at 28. Instead, the government argues that Mr. Clark is liable under a *Pinkerton* theory.

Under the Supreme Court's decision in *Pinkerton v. United States*, 328 U.S. 640, 646–48 (1946), "a defendant [may be held] responsible for the crimes of his co-conspirators, if those crimes are committed to help advance the conspiracy and are within the reasonably foreseeable scope of the conspiracy." *Irvin*, 682 F.3d at 1274; *see also United States v. Rosalez*, 711 F.3d 1194, 1206 (10th Cir. 2013) (discussing *Pinkerton* and noting that the Court "explained the basic notion behind coconspirator liability" in that case). As noted, the evidence supports the reasonable inference that Mr. Clark was an active member of the fraudulent pump-and-dump conspiracy. Laundering the proceeds of such a conspiracy would "help advance the conspiracy," *Irvin*, 682 F.3d at 1274, in that it would facilitate the concealment of the source of the funds. *See United States v. Massey*, 48 F.3d 1560, 1567 n.3 (10th Cir. 1995) ("[T]he jury could reasonably conclude that the acts of mail fraud and money laundering were both in furtherance of the [fraudulent loan] conspiracy and reasonably foreseeable."); *see also United States v. Pretty*, 98 F.3d 1213, 1220 (10th Cir. 1996) (holding, in the context of a bribery conspiracy, that "the jury's inference that the intent of these [financial]

-30-

transactions was at least in part to conceal the source of the funds was a reasonable one"). Consequently, a reasonable factfinder could have determined that it was reasonably foreseeable to Mr. Clark—as an active participant in the pump-and-dump conspiracy—that money laundering activities would be undertaken to further the conspiracy. And, more specifically, such a factfinder could have concluded that the fund transfer at issue in Count 18 was reasonably foreseeable to Mr. Clark and that, under a *Pinkerton* theory, he was accountable for it.

Thus, we reject Mr. Clark's suggestion that he could not be found criminally liable for Count 18 because he did not personally participate in the monetary transaction at issue. *See United States v. Moreland*, 622 F.3d 1147, 1169 (9th Cir. 2010) ("Pursuant to the *Pinkerton* doctrine, sufficient evidence exists in this case to uphold [the defendant's] convictions for the substantive money laundering charges provided that: (1) there is sufficient evidence to uphold his conviction for conspiracy, (2) the money laundering offenses were committed in furtherance of the conspiracy while [the defendant] was a member of the conspiracy, and (3) the actions providing the basis for the substantive charges were reasonably foreseeable to [the defendant]."); *United States v. Sullivan*, 522 F.3d 967, 977 (9th Cir. 2008) ("Even if [the defendant] was not directly involved in the wire transfers [to conceal proceeds of an unlawful bankruptcy fraud scheme], a rational juror could have found that the transfers were reasonably

foreseeable to him as part of the conspiracy . . . ."); *see also Rosalez*, 711 F.3d at 1207 (holding that a defendant convicted of conspiracy to assault the victim could be held responsible under *Pinkerton* for the victim's murder, even though he was not present during the assault, because "the murder of [the victim] was not an act that occurred separately from the assault [i.e., the object of the conspiracy], but rather was a direct, and entirely foreseeable, result of the vicious assault carried out on him"); *United States v. Silvestri*, 409 F.3d 1311, 1336 (11th Cir. 2005) ("[T]he *Pinkerton* doctrine has been applied to money laundering conspiracy cases; a defendant who joins a money laundering conspiracy may be found substantively liable for money laundering offenses committed by co-conspirators."). Accordingly, Mr. Clark's sufficiency-of-the-evidence challenge to Count 18 is unavailing.

## C.  Refusal to Appoint Attorney

Mr. Clark claims that he was denied a fair trial when the district court rejected his request under provisions of the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, to appoint substitute or additional counsel with expertise in securities law.

In November 2009, Mr. Clark's attorney, Allen Smallwood, sought to withdraw from his representation of Mr. Clark, citing Mr. Clark's inability to pay

his legal fees.[11] The district court denied Mr. Smallwood's request, noting his extensive involvement with the case for over two years. In February 2010, Mr. Smallwood filed a motion under the CJA and asked the court to appoint an attorney with securities-law experience as either substitute counsel or co-counsel for Mr. Clark. The district court denied the motion.

Mr. Clark argues that this denial violated his right to a fair trial. He draws our attention to two things: first, that the CJA requires that more than one attorney be appointed in an extremely difficult case; and second, that the government moved successfully for a declaration under the Speedy Trial Act that the case was "complex" and required more extensive preparation and a continuance of the trial, *see* R., Vol. I, at 103 (Unopposed Mot. of United States to Declare This Case a Complex Matter, filed Feb. 26, 2009) (referencing 18 U.S.C. § 3161(h)(7)(A)–(B)[12]). In essence, Mr. Clark claims that he was entitled

---

[11] In this same motion, three other attorneys representing Mr. Clark also sought to withdraw. These attorneys were R. Thomas Seymour, Scott A. Graham, and Anthony L. Allen of Seymour & Graham, LLP. They entered their appearance as "additional counsel" for Mr. Clark on October 1, 2009. R., Vol. I, at 346. They did not replace Mr. Smallwood, and, at least as the district court saw it, "their involvement was limited." *Id.* Specifically, they were brought in for two purposes: to oppose the government's motion to revoke Mr. Clark's release pending trial and to persuade the court to permit the liquidation of assets for the purpose of paying attorneys' fees. *See id.* at 152 (Entry of Appearance, filed Oct. 1, 2009) ("This appearance is, at present, limited to representation of Mr. Clark in respect of the Government's Motion to Revoke Release and in respect of the issue of payment of attorneys' fees in the case.").

[12] The motion actually cites 18 U.S.C. §§ 3161(h)(8)(A)–(B). In 2008,

(continued...)

-33-

to a securities-law expert either as a substitute for, or in addition to, Mr. Smallwood.

### 1. Standard of Review

We review the district court's denial of a motion to substitute counsel for an abuse of discretion. *See United States v. Hutchinson*, 573 F.3d 1011, 1024 (10th Cir. 2009); *United States v. Anderson*, 189 F.3d 1201, 1210 (10th Cir. 1999). To warrant substitution, a defendant must demonstrate "good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." *Hutchinson*, 573 F.3d at 1024 (quoting *United States v. Beers*, 189 F.3d 1297, 1302 (10th Cir. 1999)) (internal quotation marks omitted); *see United States v. Byrum*, 567 F.3d 1255, 1265–66 (10th Cir. 2009) (discussing factors applicable in addressing this issue). The overriding question is whether the district court's decision was one of the "rationally available choices given the facts and the applicable law in the case at hand." *Hutchinson*, 573 F.3d at 1024 (quoting *Shook v. Bd. of Cnty. Comm'rs*, 543 F.3d 597, 603 (10th Cir. 2008)) (internal quotation marks omitted).

---

[12](...continued)
however, "Congress redesignated 18 U.S.C. § 3161(h)(8) as 18 U.S.C. § 3161(h)(7)." *United States v. Hernandez-Mejia*, 406 F. App'x 330, 331 n.2 (10th Cir. 2011); *see* Judicial Administration and Technical Amendments Act of 2008, Pub. L. No. 110-406, § 13, 122 Stat. 4291, 4294 (2008). We utilize the current numbering of the applicable provisions of § 3161(h) in addressing Mr. Clark's contentions in this appeal.

"As CJA matters rarely generate published decisions," *United States v. Romero-Gallardo*, 245 F.3d 1159, 1160 (10th Cir. 2001), there is little authority on the standard of review applicable to a district court's decision to deny appointment of *additional*, expert counsel under the CJA.  Other circuits have reviewed somewhat analogous decisions for an abuse of discretion.  *See, e.g.*, *United States v. Ensign*, 491 F.3d 1109, 1113–15 (9th Cir. 2007); *United States v. Reed*, 658 F.2d 624, 628 (8th Cir. 1981); *see also* 3B Charles Alan Wright & Peter J. Henning, *Federal Practice and Procedure* § 737, at 113 (4th ed. 2013) ("The number of counsel to be assigned is . . . in the discretion of the appointing authority . . . .").

Guided by these authorities,[13] we conclude that the district court's decision to refuse appointment of *additional* counsel for a defendant, like its refusal to substitute counsel, *see Hutchinson*, 573 F.3d at 1024, is reviewable only for an abuse of discretion.  The abuse-of-discretion standard is appropriate because the decision we are tasked with reviewing is at bottom a judgment call, given the factual circumstances of the case.  Where the court is tasked with evaluating the prejudice that would befall a defendant absent additional counsel, it must consider a vast array of contextually specific matters related to the way the proceedings

---

[13]     Mr. Clark's brief is silent regarding the appropriate standard of review to assess the propriety of the district court's decision on this matter, whereas the government suggests that we should review for an abuse of discretion, *see* Aplee. Br. at 47.

have advanced.  Consequently, there "will not necessarily be a single right answer, but a range of possible outcomes the facts and law at issue can fairly support." *Big Sky Network Can., Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1186 (10th Cir. 2008); *see United States v. Gabaldon*, 91 F.3d 91, 93–94 (10th Cir. 1996) (applying an abuse-of-discretion standard to motions which required the district court to "examin[e] . . . the prejudicial impact of an error or errors when viewed in the context of an entire case").  And, "rather than pick and choose among [those outcomes] ourselves, we will defer to the district court's judgment so long as it falls within the realm of these rationally available choices." *Big Sky Network*, 533 F.3d at 1186.

As for the scope and content of the district court's inquiry concerning requests to add counsel, we find instructive decisions addressing whether to permit CJA funding for "investigative, expert, and other services necessary for adequate representation," *United States v. Solon*, 596 F.3d 1206, 1209 (10th Cir. 2010) (quoting 18 U.S.C. § 3006A(e)(1)) (internal quotation marks omitted); *cf. United States v. Kennedy*, 64 F.3d 1465, 1473–74 (10th Cir. 1995) ("An indigent defendant is not entitled to all the assistance that a wealthier counterpart might buy, but rather only to the basic and integral tools."), a decision that we also review for an abuse of discretion, *see Solon*, 596 F.3d at 1210 ("'Appointing an expert is within the discretion of the [c]ourt,' therefore, we review the denial of a CJA funding request for an abuse of discretion." (alteration in original) (citation

omitted) (quoting *United States v. Ready*, 574 F.2d 1009, 1015 (10th Cir. 1978))).

And in such instances, "the defendant must do more than allege that [an expert's]

services would be helpful." *Kennedy*, 64 F.3d at 1470. Rather, he "must

convince the court that the [additional] services are 'necessary to an adequate

defense.'" *Solon*, 596 F.3d at 1209–10 (quoting *United States v. Greschner*, 802

F.2d 373, 376 (10th Cir. 1986)).

We note that, unlike a defendant's right to spend his own money *ad

infinitum* on counsel of his choosing, *see United States v. Gonzalez-Lopez*, 548

U.S. 140, 144 (2006), the right to court-appointed counsel is geared toward the

goal of ensuring constitutionally *adequate* representation, *see United States v.

Flanders*, 491 F.3d 1197, 1216 (10th Cir. 2007) (citing *Caplin & Drysdale*, 491

U.S. at 624); *see also* 18 U.S.C. § 3006A(a) ("Representation under each [CJA]

plan *shall include* counsel *and* investigative, expert, and other services *necessary

for adequate representation*." (emphases added)). Indeed, the federal judiciary's

model CJA plan contemplates that a defendant might request the appointment of

an "additional attorney," but suggests that such appointment is available only in

"extremely difficult case[s] . . . [and] in the interest of justice." 7A Guidelines

for Administering the CJA and Related Statutes § 230.53.20 (2013) [hereinafter

CJA Guidelines]; *see Romero-Gallardo*, 245 F.3d at 1160 (suggesting that the

guidelines "do not allow for multiple counsel" outside of limited circumstances).

In all cases, we consider whether the denial of CJA funding for an additional

attorney impeded the defendant's defense, not incidentally, but directly enough to undermine a constitutionally "adequate" defense.[14] *See Kennedy*, 64 F.3d at 1470–73.

## 2.  Application to Mr. Clark's Claim

Applying the abuse-of-discretion standard to the district court's denial of Mr. Smallwood's motion for appointment of substitute or additional counsel, we conclude that the district court acted within its discretion.  The record shows that Mr. Smallwood is a highly experienced criminal defense attorney.  Further, Mr. Clark hired him even prior to the return of the indictment, while the government was investigating the activities of Mr. Clark and his alleged co-conspirators. Thus, by the time of Mr. Smallwood's CJA motion, he had represented Mr. Clark for approximately two-and-a-half years—ample time to become familiar with the facts and law applicable to Mr. Clark's case.

There is no indication of a breakdown in communication between Mr. Clark and Mr. Smallwood, nor a conflict of interest on Mr. Smallwood's part, that would justify substitution of counsel, *see Hutchinson*, 573 F.3d at 1024, even considering the fact that Mr. Clark could ostensibly no longer pay the balance of

---

[14]    We assume without deciding that Mr. Clark meets the CJA's financial eligibility requirements for the appointment of counsel and that a defendant like Mr. Clark may request the appointment of an additional attorney under the CJA where, like here, he has allegedly run out of funds to pay for privately retained counsel who is otherwise obliged to remain active in the case.

his legal fees, *see United States v. O'Neil*, 118 F.3d 65, 71–72 (2d Cir. 1997) ("There is little question that a defendant's failure to pay fees may cause some divisiveness between attorney and client, but we presume that counsel will continue to execute his professional and ethical duty to zealously represent his client, notwithstanding [a] fee dispute.").

Furthermore, in light of Mr. Smallwood's criminal-defense experience and his conduct in the case, the district court could quite reasonably conclude that Mr. Smallwood's representation was sufficient for an adequate defense. In other words, it could reasonably conclude that an additional attorney—even one more familiar with securities law—was not "*necessary* to an adequate defense." *See Solon*, 596 F.3d at 1209–10 (emphasis added) (quoting *Greschner*, 802 F.2d at 376) (internal quotation marks omitted); *United States v. Porter*, 405 F.3d 1136, 1141–42 (10th Cir. 2005) (concluding that there was no abuse of discretion in the district court's denial of the defendant's motion to substitute counsel because, *inter alia*, there was nothing in the record demonstrating that the attorney could not provide an adequate defense).

This is particularly true where the charges in this case, at their essence, concerned general allegations of fraud, and did not, for instance, present the need to synthesize highly technical securities regulations. And, although the charges were premised on voluminous, finance-related discovery, Mr. Clark has failed to point to any problems with Mr. Smallwood's representation that would undermine

the soundness of the district court's decision to deny his motion for substitute or additional counsel. For these reasons, the district court did not abuse its discretion in denying Mr. Clark's motion for appointment of substitute or additional counsel.

Finally, we reject as unpersuasive Mr. Clark's facile attempt to link the concept of a "complex" case under the Speedy Trial Act to the concept of an "extremely difficult" case contemplated by the CJA Guidelines. *See* CJA Guidelines § 230.53.20. The CJA Guidelines and the Speedy Trial Act serve wholly different purposes. *Compare, e.g.*, *id.* § 110.10 (noting that the goal of the Defender Services program is to "ensure that the right to counsel guaranteed by the Sixth Amendment, the [CJA], and other congressional mandates is enforced on behalf of those who cannot afford to retain counsel and other necessary defense services"), *with* Speedy Trial Act of 1974 § 101, 18 U.S.C. § 3161 (suggesting that the Act was passed "so as to assure a speedy trial" in line with the defendant's Sixth Amendment right). In sum, for the reasons noted, we conclude that Mr. Clark's appointment-of-counsel challenge fails.

## D.     Severance

Mr. Clark asserts that the district court erred in refusing to allow him to stand trial alone. Principally, he objects to the district court's decision not to sever his trial from that of Mr. Gordon, his co-defendant. He reasons that the admission of inculpatory out-of-court statements by Mr. Gordon violated *Bruton*

-40-

*v. United States*, 391 U.S. 123 (1968).  He also challenges the district court's decision on three other grounds.  Specifically, Mr. Clark contends that the prejudicial effects of the district court's refusal not to allow him to stand trial alone were that (1) he was prevented from compelling Mr. Gordon to testify, (2) evidence that was relevant to the culpability of his co-defendants unfairly spilled over onto him, and (3) he was forced to stand trial with co-conspirators who were unavailable for cross-examination or confrontation.  We conclude that the district court did not commit reversible error.

### 1.     *Bruton* **Claim**

Mr. Clark argues that the government—through Mr. Lindberg's testimony—presented evidence that Mr. Gordon often referred to Mr. Clark as "heat-resistant," meaning that he was "somebody who would not buckle under the pressure of an SEC investigation."  R., Vol. VIII, at 2974; *see id.* at 186.  The admission of these statements at his joint trial, reasons Mr. Clark, violated his Sixth Amendment right of confrontation as explicated in *Bruton*.

"We review *de novo* the legal issue of whether the admission of the non-testifying codefendant's statements/confession in a joint trial violated the defendant's Sixth Amendment right to confrontation."  *United States v. Sarracino*, 340 F.3d 1148, 1158–59 (10th Cir. 2003) (quoting *United States v. Verduzco-Martinez*, 186 F.3d 1208, 1212 (10th Cir.1999)) (internal quotation marks omitted).

The Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. "In *Bruton*, the Court held that it would violate the Confrontation Clause to allow the confession of a non-testifying co-defendant that implicated the defendant to be used against that defendant [at their joint trial]." *United States v. Patterson*, 713 F.3d 1237, 1247 (10th Cir. 2013); *see United States v. Smalls*, 605 F.3d 765, 768 n.2 (10th Cir. 2010) ("In *Bruton*, the Court held that [the] defendant was deprived of his Sixth Amendment right to confrontation where his accomplice's confession . . . was introduced at their joint trial."); *see also Greene v. Fisher*, 132 S. Ct. 38, 42–43 (2011) (noting that *Bruton* establishes that "the Confrontation Clause forbids the prosecution to introduce a nontestifying codefendant's confession implicating the defendant in the crime").

*Bruton* applies "even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 201–02 (1987); *see Dickerson v. United States*, 530 U.S. 428, 458 (2000) (Scalia, J., dissenting) (noting that *Bruton* "was based . . . upon the self-evident proposition that the inability to cross-examine an available witness whose *damaging* out-of-court testimony is introduced violates the Confrontation Clause, *combined* with the conclusion that in these circumstances a mere jury instruction can never be relied upon to prevent the testimony from being damaging" (emphases added)).

We have cautioned that *Bruton*'s rule is "a narrow one"; it applies only when the co-defendant's statement is "so inculpatory as to the defendant that the practical and human limitations of the jury system cannot be ignored." *Sarracino*, 340 F.3d at 1160 (quoting *United States v. Rahseparian*, 231 F.3d 1267, 1277 (10th Cir. 2000)) (internal quotation marks omitted); *see United States v. Nash*, 482 F.3d 1209, 1218 (10th Cir. 2007) ("[T]he rule announced in *Bruton* is a limited one."). However, *Bruton* provides the foundation for affirmative remedial measures—most notably, severance—upon a proper showing that a co-defendant's statement offered into evidence would inculpate the defendant. *See Nash*, 482 F.3d at 1217–18 (discussing the *Bruton* process). These measures are meant to avoid the extrinsic (i.e., collateral) damage to a defendant from the jury's undue consideration of a co-defendant's facially inculpatory statement—a factor that the jury would be highly unlikely to "disregard" and one that cannot be remedied by a curative instruction. *See Bruton*, 391 U.S. at 128–29. When evidence is admitted in violation of *Bruton*, "we must reverse unless we can conclude beyond a reasonable doubt that the constitutional error was harmless." *Sarracino*, 340 F.3d at 1161 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

Since *Bruton* was decided, the Supreme Court's Confrontation Clause jurisprudence has evolved, beginning with *Crawford v. Washington*, 541 U.S. 36 (2004), and extending through *Davis v. Washington*, 547 U.S. 813 (2006), to the Court's more recent Confrontation Clause decisions: specifically, *Melendez-Diaz*

*v. Massachusetts*, 557 U.S. 305 (2009); *Michigan v. Bryant*, 131 S. Ct. 1143 (2011); and *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011). "In *Crawford*, the Supreme Court held that the Sixth Amendment precluded the admission of out-of-court statements that are testimonial, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *Patterson*, 713 F.3d at 1246–47; *see Crawford*, 541 U.S. at 53–54; *see also Bryant*, 131 S. Ct. at 1153 ("[*Crawford*] limited the Confrontation Clause's reach to testimonial statements and held that in order for testimonial evidence to be admissible, the Sixth Amendment 'demands what the common law required: unavailability and a prior opportunity for cross-examination.'" (quoting *Crawford*, 541 U.S. at 68)).

Like our sister circuits, we have recognized the need to interpret *Bruton* "consistent[ly] with the present state of Sixth Amendment law." *Smalls*, 605 F.3d at 768 n.2; *see, e.g.*, *United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010); *United States v. Johnson*, 581 F.3d 320, 325–26 (6th Cir. 2009); *United States v. Avila Vargas*, 570 F.3d 1004, 1008–09 (8th Cir. 2009).

Notably, *Crawford* made clear that the Confrontation Clause applies only if a statement is "testimonial" in nature, for "[o]nly statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis*, 547 U.S. at 821 (citing *Crawford*, 541 U.S. at 51). Indeed, reflecting on the text and history of the Confrontation Clause, the Court in *Crawford* explained that out-of-court *testimonial* statements, or the "'bear[ing of] testimony,'" were

the core "evil[s] at which the Confrontation Clause was directed." 541 U.S. at

50–51 (quoting 2 N. Webster, An American Dictionary of the English Language

(1828)); *see id.* at 50 (noting the Founders' concern with the "use of *ex parte*

examinations as evidence against the accused"); *see also Bullcoming*, 131 S. Ct.

at 2713 ("[F]idelity to the Confrontation Clause [does not] permit[] admission of

[t]estimonial statements of witnesses absent from trial," absent a showing that

"the declarant is unavailable, and only where the defendant has had a prior

opportunity to cross-examine." (fourth alteration in original) (quoting *Crawford*,

541 U.S. at 59) (internal quotation marks omitted)).[15]

*Crawford* indicates that the class of testimonial statements that fall within

the protective ambit of the Confrontation Clause *includes*, but is not limited to,

statements covered also by *Bruton*. *See Crawford*, 541 U.S. at 51–52 (listing as

examples of testimonial statements "extrajudicial statements . . . contained in

---

[15] The *Crawford* Court also opined that the clause generally "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U.S. at 59 n.9. In other words, as we have clarified, "A defendant's confrontation rights are implicated by the admission of testimonial statements against the defendant . . . only when they are admitted to establish the truth of the matter asserted in the statement." *United States v. Pablo*, 696 F.3d 1280, 1287 (10th Cir. 2012); *accord United States v. Walker*, 673 F.3d 649, 657–58 (7th Cir. 2012). That is, the Confrontation Clause's scope *generally* extends no further than testimonial hearsay. The upshot is that the clause "constitute[s] an absolute bar to the admissibility of a testimonial hearsay statement where the declarant was unavailable to testify at trial and the defendant had no prior opportunity to cross-examine the declarant." *Smalls*, 605 F.3d at 774.

formalized testimonial materials, such as affidavits, depositions, prior testimony, *or confessions*" (emphasis added) (quoting *White v. Illinois*, 502 U.S. 346, 365 (1992) (Thomas, J., concurring in part and concurring in judgment)) (internal quotation marks omitted)); *see also Jones v. Basinger*, 635 F.3d 1030, 1049 n.6 (7th Cir. 2011) ("The use of a non-testifying accomplice's confession . . . in seventeenth century England set in motion the series of legal reforms eventually resulting in the Confrontation Clause itself." (citing *Crawford*, 541 U.S. at 44–46)); *cf. Smalls*, 605 F.3d at 768 n.2 (noting that "the *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements").  Thus, we are obliged to "view *Bruton* through the lens of *Crawford*" and, in doing so, we consider "whether the challenged statement is testimonial."  *Figueroa-Cartagena*, 612 F.3d at 85.

In *Smalls*, based upon our synthesis of *Crawford*, *Davis*, and our own Confrontation Clause precedent, we posited two possible definitions of a "testimonial" statement: (1) "a formal declaration made by the declarant that, when objectively considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution"; or (2) "[a] formal statement [such that] a reasonable person in the position of the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime."  605 F.3d at 778; *cf. United States v. Solorio*, 669 F.3d

943, 953 (9th Cir. 2012) ("[S]tatements made out-of-court with a primary purpose other than possible prosecutorial use are nontestimonial."). We did not choose in *Smalls* between the two definitions because we found the statement at issue in *Smalls* to be nontestimonial "regardless of which of the foregoing definitions we apply." 605 F.3d at 778. We employ the same approach here and conclude that the statement at issue is not testimonial under either definition.

Mr. Clark contends that the evidence—through Mr. Lindberg's testimony—of Mr. Gordon's out-of-court statements referring to Mr. Clark as "heat-resistant" violates *Bruton*. However, because the statement is not testimonial, we disagree. The statement was made to Mr. Lindberg, a co-conspirator, in furtherance of the underlying conspiracy. In particular, the group wanted to install Mr. Clark as president of Global Beverage so that, if necessary, he could withstand the psychological pressure of a federal investigation and not disclose the conspirators' illegal endeavors. Mr. Gordon's statements were not made to law enforcement investigators, nor could a reasonable person in Mr. Gordon's position have objectively foreseen that the primary purpose for his statements was for use in the investigation or prosecution of the pump-and-dump conspiracy. *See Bryant*, 131 S. Ct. at 1154. Thus, we conclude that they fall outside the protective ambit of the Confrontation Clause and, by extension, *Bruton*.

In considering a Confrontation Clause challenge—predicated on *Crawford*

and *Bruton*—to the admission of two statements made in the context of a narcotics-conspiracy prosecution, we recently reached a very similar conclusion. Specifically, in *Patterson*, we succinctly reasoned as follows: "The admission of these two statements violated neither *Crawford* nor *Bruton* because both statements were made in furtherance of a conspiracy and were therefore nontestimonial." 713 F.3d at 1247. Likewise, our decision in *United States v. Townley*, 472 F.3d 1267 (10th Cir. 2007), bolsters our holding here. There, following *Crawford* and *Davis*, we determined that certain out-of-court co-conspirator statements were not testimonial because "[n]one of [them] was made at a hearing or trial or as a result of police interrogation, and no reasonable person in the position of the[] declarants would have objectively foreseen that these statements would be used in the investigation or prosecution of the[] conspiracy." *Townley*, 472 F.3d at 1275 (citation omitted); *see Melendez-Diaz*, 557 U.S. at 324 (suggesting that "business records or statements in furtherance of a conspiracy" are "statements that by their nature [a]re not testimonial" (quoting *Crawford*, 541 U.S. at 56) (internal quotation marks omitted)); *see also Bourjaily v. United States*, 483 U.S. 171, 181–83 (1987) (discussing the co-conspirator exception to the hearsay rule and its relationship to the protections afforded by the Confrontation Clause). We thus concluded in *Townley* that the Confrontation

Clause did not apply.[16]  472 F.3d at 1275.  For like reasons, the clause does not apply here either.  In sum, based upon the foregoing, we conclude that, because Mr. Gordon's statements were not testimonial, Mr. Clark's *Bruton* claim must fail.

## 2.    Other Severance Issues

Mr. Clark makes three remaining arguments concerning the district court's failure to allow him to stand trial alone.  Mr. Clark argues that the prejudicial effect of this decision was that (1) he was prevented from compelling Mr. Gordon to testify, (2) evidence that was relevant to the culpability of his co-defendants unfairly spilled over onto him, and (3) he was forced to stand trial with co-conspirators who were unavailable for cross-examination or confrontation.  We reject each argument and conclude that the district court did not abuse its discretion in denying severance.

---

[16]    We also recognized that the Supreme Court's Confrontation Clause jurisprudence, specifically *Crawford* and *Davis*, "le[ft] longstanding interpretation of the Federal Rules of Evidence untouched," and we rejected the contention that *Crawford* "somehow eviscerated Federal Rule of Evidence 801(d)(2)(E)," applicable to co-conspirator statements.  *Townley*, 472 F.3d at 1273.  "Rule 801(d)(2)(E) provides that '[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.'"  *Id.* (alterations in original) (quoting Fed. R. Evid. 801(d)(2)(E)).  In order for a statement to be "in furtherance of the conspiracy" it must be "intended to promote the conspiratorial objectives."  *United States v. Reyes*, 798 F.2d 380, 384 (10th Cir. 1986) (quoting *United States v. Hamilton*, 689 F.2d 1262, 1270 (6th Cir. 1982)) (internal quotation marks omitted).

### a. Standard of Review

There are two significant provisions that frequently are implicated by severance claims. The first is Federal Rule of Criminal Procedure Rule 8(b), which "permits an indictment to charge two or more defendants 'if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.'" *United States v. Pursley*, 577 F.3d 1204, 1215 (10th Cir. 2009) (quoting Fed. R. Crim. P. 8(b)); *cf.* Fed. R. Crim. P. 13 ("The court may order that separate cases be tried together as though brought in a single indictment or information if all offenses and all defendants could have been joined in a single indictment or information."). Rule 8(b) embodies a "preference in the federal system for joint trials of defendants who are indicted together," *Pursley*, 577 F.3d at 1215 (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)) (internal quotation marks omitted); *see Marsh*, 481 U.S. at 209 ("Joint trials play a vital role in the criminal justice system . . . ."), and it is broadly construed so as "to enhance the efficiency of the judicial system," *United States v. Morales*, 108 F.3d 1213, 1219 (10th Cir. 1997). Moreover, we indulge a presumption that co-conspirators in a conspiracy trial should be tried together. *See Pursley*, 577 F.3d at 1215; *see also United States v. Stiger*, 413 F.3d 1185, 1197 (10th Cir. 2005) ("[I]n a conspiracy trial it is preferred that persons charged together be tried together." (quoting *United States v. Scott*, 37 F.3d 1564, 1579 (10th Cir. 1994)) (internal quotation marks omitted)).

The second provision is Federal Rule of Criminal Procedure 14(a). It provides that "a court 'may' sever the trials of more than one defendant if joinder 'appears to prejudice a defendant or the government.'" *Pursley*, 577 F.3d at 1215 (quoting Fed. R. Crim. P. 14(a)). Prejudice for Rule 14(a) purposes means "actual prejudice." *United States v. Caldwell*, 560 F.3d 1214, 1221 (10th Cir. 2009). Thus, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. That risk is present when the jury considers evidence against a defendant that is admissible only against a co-defendant, and is increased when multiple defendants are tried together "in a complex case" and "have markedly different degrees of culpability." *Sarracino*, 340 F.3d at 1165 (quoting *Zafiro*, 506 U.S. at 539) (internal quotation marks omitted). However, "neither 'a mere allegation that defendant would have a better chance of acquittal in a separate trial' nor an argument that evidence against one defendant would have a 'spillover effect' on another defendant demonstrates prejudice." *United States v. Jones*, 530 F.3d 1292, 1303 (10th Cir. 2008) (quoting *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005)).

The district court is the primary referee on severance claims, for we, as an appellate court, have only a distant view of the ring. "Rule 14 leaves the determination of risk of prejudice and any remedy for such prejudice to the sound

-51-

discretion of the district court," *Morales*, 108 F.3d at 1220, and "[a] defendant seeking to vacate a conviction based upon the denial of a motion to sever faces a steep challenge," *Pursley*, 577 F.3d at 1215; *see United States v. Wardell*, 591 F.3d 1279, 1299 (10th Cir. 2009). "We review the district court's denial of a motion to sever for an abuse of discretion." *Pursley*, 577 F.3d at 1215 (quoting *United States v. Hall*, 473 F.3d 1295, 1302 (10th Cir. 2007)) (internal quotation marks omitted).

### b. Inability to Compel Mr. Gordon's Testimony

Mr. Clark asserts that his inability to compel Mr. Gordon's testimony at their joint trial violated his confrontation rights. He argues that, without Mr. Gordon as a witness, he "did not have the opportunity to rebut [Mr.] Gordon's otherwise hearsay statement about [Mr.] Clark being 'heat resistant,'" which was "the most significant statement" used against him. Aplt. Opening Br. at 19. He also states that the joint trial "greatly affected" his own decision not to testify in his defense. *Id.*

In this context, to determine whether the district court abused its discretion in denying a severance motion, we look to a nonexhaustive list of factors dubbed the "*McConnell* factors." *See Pursley*, 577 F.3d at 1215 (internal quotation marks omitted). These are:

> 1) the likelihood that the co-defendant would in fact testify at the movant's severed trial and waive his Fifth Amendment privilege;
> 2) the significance of the testimony in relation to the defendant's

theory of defense; 3) the exculpatory nature and effect of such testimony; 4) the likelihood that the co-defendant's testimony would be impeached; 5) the extent of prejudice caused by the absence of the testimony; 6) the effect of a severance on judicial administration and economy; [and] 7) the timeliness of the motion.

*Id*. at 1215–16 (alteration in original) (quoting *United States v. McConnell*, 749 F.2d 1441, 1445 (10th Cir. 1984)) (internal quotation marks omitted).

Under this rubric, Mr. Clark offers nothing that would permit us to meaningfully evaluate the district court's severance decision. For instance, he makes no argument concerning the likelihood that Mr. Gordon would have agreed to testify at Mr. Clark's separate trial. Nor does he explain what the significance or exculpatory value of that testimony would have been, or articulate how he was prejudiced by the absence of such testimony.

Mr. Clark provides only the conclusory, unilluminating assertions that he could have "rebut[ted]" Mr. Gordon's reference to him as being "heat resistant" and that the joint trial "greatly affected" his own decision not to testify. Aplt. Opening Br. at 19 (internal quotation marks omitted). As to the latter contention, he does not explain whether he would have *actually* testified, or as to what matters his testimony would have been relevant. *Cf. United States v. Lindsey*, 782 F.2d 116, 118 (8th Cir. 1986) (concluding that the defendant failed to show that he was prejudiced by the district court's failure to sever his counts of conviction, even though he argued that he would have testified at a separate trial, because he

failed to make "a convincing showing that he ha[d] both important testimony to give concerning one count and a strong need to refrain from testifying on the other").

Furthermore, Mr. Clark has pointed to no basis for a conclusion that Mr. Gordon's admitted comments would have been subject to an effective counter-attack in a separate trial. "[S]peculation is insufficient to require severance." *Pursley*, 577 F.3d at 1216; *see Hall*, 473 F.3d at 1302 (holding that the district court did not abuse its discretion in denying a motion for severance where the defendant had not shown that the exculpatory value of a co-defendant's testimony in a separate trial could have made a material difference); *United States v. Powell*, 982 F.2d 1422, 1433 (10th Cir. 1992) (concluding that there was no abuse of discretion in the district court's denial of severance even where a co-defendant signed an affidavit indicating that he would testify because the "testimony would totally lack credibility" in light of "[t]he overwhelming evidence at trial" against the co-defendant that would impeach him). With effectively nothing to go on from Mr. Clark, and in light of our preference for joint co-conspirator trials, *see Pursley*, 577 F.3d at 1215, we conclude that the district court did not abuse its discretion in denying severance on this ground.

### c. Spillover Effect of Evidence Against Co-defendants

Mr. Clark further argues that evidence introduced against his co-defendants had a spillover effect that prejudiced his defense. He points in particular to Mr.

Lindberg's testimony that persistently referred to "the group" but "barely mentioned" Mr. Clark. Aplt. Opening Br. at 15 (internal quotation marks omitted). However, Mr. Lindberg specifically described Mr. Clark's involvement in the conspiracy at several points during his testimony. *See, e.g.*, R., Vol. VIII, at 174–75 (noting that Mr. Clark was "one of those people" that "kept money" when the conspirators started dumping Deep Rock stock); *id.* at 186 (noting that Mr. Gordon recommended installing Mr. Clark as president of the company that was ultimately called Global Beverage because "he's been a good soldier in the past and he's heat-resistant"); *id.* at 212 (responding to a question asking whether Mr. Clark sold Deep Rock stock out of turn again, after Mr. Gordon admonished him, "I don't believe he did"). The evidence shows that Mr. Clark was involved and cooperated with his co-defendants in, and substantially profited from, the illegal scheme. Simply put, the evidence against Mr. Clark and his co-defendants was "overlapping and intertwined." *Morales*, 108 F.3d at 1220; *see United States v. Zapata*, 546 F.3d 1179, 1192 (10th Cir. 2008) (concluding that there was no prejudice stemming from a risk of "spillover" evidence in a conspiracy trial because "there was clear and direct testimony at trial that specifically implicated [the defendant] in the conspiracy"); *see also Wardell*, 591 F.3d at 1300 ("[T]he nearly insuperable rule in this circuit is that a defendant cannot obtain severance simply by showing that the evidence against a co-defendant is more damaging than the evidence against herself." (quoting *United States v. Dazey*, 403 F.3d

-55-

1147, 1165 (10th Cir. 2005)) (internal quotation marks omitted)).

Finally, although Mr. Gordon was charged with three additional counts in the twenty-four count indictment, the facts relating to the separate counts did not render null the jury's ability "to segregate the evidence associated with each defendant's individual actions." *Zapata*, 546 F.3d at 1191. The district court instructed the jury to segregate out evidence that was not directed at Mr. Clark, *see* R., Vol. VIII, at 2516–17 (Jury Instructions, given Apr. 29, 2010), and Mr. Clark has not articulated any reason why the jury was unable to follow the instructions in this respect, *see Zapata*, 546 F.3d at 1191–92 (suggesting that the district court's instruction limited the prejudice of any "spillover" to a defendant that might result from counts concerning his co-defendants); *see also Caldwell*, 560 F.3d at 1213 ("We presume that the jury obey[s] [its] instructions.").

We thus reject Mr. Clark's claim of prejudicial spillover and conclude that the district court did not abuse its discretion in denying severance on this ground.

### d. Absent Co-defendants

Finally, Mr. Clark claims that conducting the trial with absent co-defendants—specifically, Dean Sheptycki, the creator of much of the promotional material, and Josh Lankford—violated his rights. Under indictment for the pump-and-dump conspiracy, Mr. Sheptycki was apprehended in the Bahamas, but the Bahamian government declined to honor the government's extradition request, so he was not present for the trial. Also indicted,

co-conspirator Lankford's whereabouts were unknown at the time of trial and the government classified him as a fugitive. Neither Mr. Sheptycki nor Mr. Lankford was actually tried by the government *in absentia* in the case, but there was considerable evidence detailing their roles in the charged conspiracy. Mr. Clark complains that his legal rights were infringed because he was "unable to cross-examine or otherwise confront" Mr. Lankford and Mr. Sheptycki. Aplt. Opening Br. at 18. We reject this claim.

Standing alone, Mr. Clark's assertions do not satisfy his "'heavy burden' of showing 'real prejudice.'" *Wardell*, 591 F.3d at 1299 (quoting *McConnell*, 749 F.2d at 1444). He does not explain how the absence of Messrs. Sheptycki and Lankford "compromise[d] a *specific* trial right" of his—including his right of cross-examination under the Confrontation Clause[17]—or "prevent[ed] the jury from making a reliable judgment about [his] guilt or innocence." *Stiger*, 413 F.3d at 1197 (emphasis added) (quoting *United States v. Edwards*, 69 F.3d 419, 434 (10th Cir. 1995)) (internal quotation marks omitted).

Simply pointing out that certain co-defendants were absent does not suffice. *Cf. United States v. Edmonson*, 962 F.2d 1535, 1545 (10th Cir. 1992) (holding

---

[17] Mr. Clark's arguments on this issue are decidedly speculative. *See, e.g.*, Aplt. Opening Br. at 18 ("[Mr.] Clark, at the very least, deserves a trial where either evidence of statements or actions that *could be considered statements* by Lankford and/or Sheptycki are excluded." (emphasis added)). He points to no evidence offered by the government that would violate his confrontation rights.

that absence of co-defendant tried *in absentia* "did not have a significant adverse impact upon the case" and thus "it would obviously [have been] unnecessary for the trial judge to grant a severance"); *cf. also United States v. Tarango*, 396 F.3d 666, 674 (5th Cir. 2005) ("[A defendant is] not prejudiced simply by the fact that her co-defendant [i]s being tried in absentia."); *Murr v. United States*, 200 F.3d 895, 904 (6th Cir. 2000) ("Petitioner has not made the required showing of factually specific and compelling prejudice as a result of the joint trial. He offers absolutely no evidence in support of his claim that [the co-defendant's] absence constituted extreme prejudice to him in that the jury assumed that [the co-defendant's] absence indicated that Petitioner was guilty.").[18] We conclude that the district court did not abuse its discretion in denying severance on this ground.

---

[18] We pause briefly to note that Mr. Clark also intimates that he was prejudiced because his name appeared on the jury verdict forms along with Messrs. Sheptycki and Lankford. *See* Aplt. Opening Br. at 19–20. We do not construe Mr. Clark as presenting a distinct ground of error by this suggestion, in that it appears as a tangential remark in the section of his brief addressing the alleged prejudicial spill-over effect caused by the introduction of evidence related to his co-conspirators. However, even if it were an assertion of error, we would conclude that it is waived. When the issue of verdict forms came up before the district court, Mr. Clark specifically requested, over the government's insistence to the contrary, that Mr. Sheptycki's and Mr. Lankford's names remain on the forms. *See* R., Vol. VIII, at 2403–06 (Trial Tr., dated Apr. 27, 2010). Thus, Mr. Clark would have invited any error associated with the inclusion of the two men's names on the verdict form and, consequently, waived any appellate challenge regarding the matter. *See, e.g.*, *United States v. Teague*, 443 F.3d 1310, 1317–18 (10th Cir. 2006) (holding that a party waives an issue for appeal when he "'invites' an error by suggesting that the court take particular action").

**E. Speedy Trial Act**

Mr. Clark claims that the district court erred in refusing to dismiss the indictment pursuant to the Speedy Trial Act, 18 U.S.C. §§ 3161–3174, primarily because the court's March 10, 2009, ends-of-justice continuance "was inadequate." Aplt. Opening Br. at 23.

Roughly two weeks after the indictment was unsealed, the government filed an unopposed motion to declare the case "complex" under 18 U.S.C. § 3161(h) in light of the massive pending discovery and complex legal issues presented. On March 10, the district court granted the motion, concluding that the "ends of justice" outweighed the public's interest in a speedy trial. More specifically, noting that it had considered the statutory factors and our precedent, the court stated:

> The substantial volume of discovery supports the government's argument that this case is unusually complex and, with counsel exercising due diligence, will require more than the 70 days provided by the Act for the parties to prepare for trial. It would not be reasonable to expect defense counsel to review the voluminous evidence, prepare pretrial motions, and adequately represent their clients at trial in less than 70 days. Failure to treat this case as a complex case would deny counsel for all parties time to prepare, and this consideration outweighs defendant's interest in a speedy trial.
>
> . . . While a speedy resolution of criminal cases serves the public interest, it does not benefit the public if a complex criminal case is rushed and a miscarriage of justice results. Given the complex nature of these proceedings, the ends-of-justice served by treating this as a complex case outweigh the public's interest in a speedy trial.

-59-

R., Vol. I, at 121 (Order Granting Unopposed Mot. of the United States to Declare This Case a Complex Matter, filed Mar. 10, 2009). In that order, it struck the initial trial date. Then, through entry of a minute order one week later, the court set the trial date for January 19, 2010.

After reassignment, the new district judge (i.e., Judge Payne) struck the January 19 trial date. On March 17, 2010, Mr. Clark and Mr. Gordon filed a joint motion to dismiss the indictment under the Speedy Trial Act, challenging, *inter alia*, the validity of the court's ends-of-justice continuance. The district court denied the motion, and the trial began on April 5, 2010.

"The Speedy Trial Act . . . requires that a criminal defendant's trial commence within 70 days after he is charged or makes an initial appearance, whichever is later . . . ."[19] *Bloate v. United States*, 559 U.S. 196, 198–99 (2010); *accord United States v. Loughrin*, 710 F.3d 1111, 1119 (10th Cir. 2013); *United States v. Larson*, 627 F.3d 1198, 1203 (10th Cir. 2010). The Act excludes "certain enumerated events" from this time period, *see Bloate*, 559 U.S. at 199 (discussing 18 U.S.C. § 3161(h)), such as "proceedings concerning the defendant," 18 U.S.C. § 3161(h)(1), and time which the court determines should

---

[19] Mr. Clark agrees that the seventy-day clock under the Act commenced on the day the indictment was unsealed, because that was when he first appeared before the court. *See* 18 U.S.C. § 3161(c)(1) (noting "the trial of a defendant charged in an information or indictment . . . shall commence within seventy days from the filing date (*and making public*) of the information or indictment" (emphasis added)).

be excluded because "the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial," *id.* § 3161(h)(7)(A). *See also Loughrin*, 710 F.3d at 1119 (noting that "not every day counts towards the seventy-day limit because of a multitude of statutory exclusions"). The Act permits exclusion of time under § 3161(h)(7)(A) to serve the ends of justice where "the case is so unusual or so complex . . . that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by [the Act]." *Id.* § 3161(h)(7)(B)(ii).

We review the district court's decision to grant a continuance in the "ends of justice" for an abuse of discretion. *See United States v. Toombs*, 574 F.3d 1262, 1268 (10th Cir. 2009) ("We apply an abuse of discretion standard to a district court's decision to grant an ends-of-justice continuance." (quoting *United States v. Gonzales*, 137 F.3d 1431, 1433 (10th Cir. 1998)) (internal quotation marks omitted)). "At the same time, we review the district court's compliance with the Act de novo and its findings of fact for clear error." *Loughrin*, 710 F.3d at 1117; *see Toombs*, 574 F.3d at 1268 (noting that we "review[] de novo . . . the district court's compliance with the legal requirements of the Speedy Trial Act").

Mr. Clark narrowly frames his argument, challenging the district court's March 10 ends-of-justice order, claiming that the order did not "set[] forth and justify[] any specific time period for the continuance," Aplt. Opening Br. at

-61-

22–23, and was otherwise conclusory and lacking in the detail required by the Act. We are not persuaded by Mr. Clark's arguments.

First, Mr. Clark does not explain why the district court's failure to specify immediately a trial date when it entered the March 10 ends-of-justice continuance order constituted legal error, and we discern no foundation for that notion. Indeed, we have expressly held that "while it is preferable to set a specific ending date for a continuance, . . . an open-ended continuance for a reasonable time period is permissible." *United States v. Spring*, 80 F.3d 1450, 1458 (10th Cir. 1996); *see, e.g.*, *United States v. Santiago-Becerril*, 130 F.3d 11, 18 (1st Cir. 1997) ("Open-ended continuances are not prohibited *per se*."). In assessing whether an open-ended continuance was terminated (i.e., delimited by a definite end date) in a reasonable time frame, courts naturally look beyond the continuance order itself to other documents in the record associated with it. *See Spring*, 80 F.3d at 1458; *see also United States v. Ross*, 703 F.3d 856, 877 (6th Cir. 2012) ("[T]he latter order's reference to 'the new trial date' was not an 'open-ended period' but was merely a reference to the new, June 24, 2008 trial date specified in the former order. These orders satisfy the statutory requirements.").

To the extent that the March 10 order created an open-ended continuance, a survey of the record reveals that the district court supplied a concrete end date (i.e., a trial date of January 19) in its minute order with virtually no delay—*viz.*,

one week later.  This week was clearly a reasonable period.  *See Spring*, 80 F.3d at 1458 ("The new trial date was set, thereby providing a specific ending date to the continuance, eleven days later . . . . Given the circumstances of this case, the open-ended continuance initially granted was reasonable in length.").

Furthermore, focusing on Mr. Clark's challenge to the adequacy of the district court's findings, we reject Mr. Clark's assertion that they were conclusory and insufficient under our case law.  When analyzing the terms of the same order in our *Gordon* decision, we concluded that the district court properly struck the ends-of-justice balance to justify the continuance of the trial date to January 19, 2010, and that conclusion is controlling here.  *See* 710 F.3d at 1158–59.

In sum, we find no merit in Mr. Clark's speedy trial challenges and reject them.

### III.  Conclusion

For the foregoing reasons, we **AFFIRM** Mr. Clark's conviction.